[redacted]

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| IN RE: RARE BREED TRIGGERS PATENT LITIGATION | CASE NO. 4:26-md-03176-ALM |
| ABC IP, LLC et al.,<br>Plaintiffs,<br>vs.<br>80MILLS LLC d/b/a TACTICAL TITAN SUPPLY et al.,<br>Defendants. | (CASE NO. 4:26-cv-00380-ALM) |
| RARE BREED TRIGGERS, INC. et al.,<br>Plaintiffs,<br>vs.<br>DNT LLC d/b/a DEEZ NUTZ TACTICAL et al.,<br>Defendants. | (CASE NO. 4:26-cv-00377-ALM) |
| ABC IP, LLC et al.,<br>Plaintiffs,<br>vs.<br>HANES TACTICAL LLC et al.,<br>Defendants. | (CASE NO. 4:26-cv-00369-ALM) |

| | |
|---|---|
| ABC IP, LLC et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>HARRISON GUNWORKS LLC et al.,<br><br>Defendants. | (CASE NO. 4:26-cv-00379-ALM) |
| ABC IP, LLC et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>STEVEN THANH NGUYEN d/b/a POLYMER PEW et al.,<br><br>Defendants. | (CASE NO. 4:26-cv-00425-ALM) |
| ABC IP, LLC et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>Z3 PRODUCTIONS LLC d/b/a Z3PRO,<br><br>Defendant. | (CASE NO. 4:26-cv-00367-ALM) |

**DEFENDANTS' OPPOSITION TO**
**PLAINTIFFS' CONSOLIDATED MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

I. BACKGROUND ........ 1

II. APPLICABLE LAW ........ 3

III. DISCUSSION ........ 5

A. Plaintiffs Cannot Establish a Strong Likelihood of Success on the Merits ........ 5

B. Plaintiffs Have Not Carried Their Burden To Show Irreparable Harm as to Any Defendant ........ 7

1. Plaintiffs' Aggregated, One-Size-Fits-All Showing Cannot Support Defendant-Specific Relief. ........ 7

2. Plaintiffs' Fourteen-Month Delay Defeats Any Claim of Emergency Relief. ........ 9

3. Plaintiffs' Durable-Goods and Lost-Sales Theories Show, At Most, a Damages Case ........ 11

4. Plaintiffs' Price-Erosion Theory Is Calculable and Market-Wide—Not Attributable to These Defendants ........ 14

5. Plaintiffs' Market-Share, Dealer, Lead-Time, and Innovator-Reputation Theories Are Speculative and Not Defendant-Specific ........ 16

6. Product Differences and Market Segmentation Break Plaintiffs' Causal Chain ........ 19

7. Plaintiffs' Cascading-Entry and Collectability Theories Are Speculative and Self-Defeating ........ 20

C. The Balance of Harms Favors Defendants ........ 22

D. The Public Interest Favors Denial of the Requested Injunction ........ 24

E. An Injunction Would Require Substantial Security ........ 26

CONCLUSION ........ 27

HEARING ........ 28

# TABLE OF AUTHORITIES

**CASES** **Page(s)**

*ABC IP, LLC v. Peak Tactical, LLC,*
No. 26-CV-18-R, Dkt. #39 (D. Wyo. Feb. 13, 2026) .............................................. *passim*

*Alpek Polyester, S.A. v. Polymetrix AG,*
No. 2021-1706, 2021 WL 5974163 (Fed. Cir. Dec. 16, 2021).......................................5, 6

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,*
239 F.3d 1343 (Fed. Cir. 2001)...........................................................................................22

*Apple Inc. v. Samsung Elecs. Co.,*
678 F.3d 1314 (Fed. Cir. 2012)...............................................................7, 8, 10, 15

*Apple Inc. v. Samsung Elecs. Co.,*
735 F.3d 1352 (Fed. Cir. 2013)........................................................................4, 20

*Automated Merch. Sys., Inc. v. Crane Co.,*
357 F. App'x 297 (Fed. Cir. 2009) ...............................................................11, 19

*BlephEx, LLC v. Myco Indus.,*
24 F.4th 1391 (Fed. Cir. 2022) ...........................................................................4

*Commil USA, LLC v. Cisco Sys.,*
575 U.S. 632 (2015)...........................................................................................6

*Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.,*
424 F.3d 1293 (Fed. Cir. 2005).........................................................................5, 6

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.,*
246 F.3d 1336 (Fed. Cir. 2001)...........................................................................14

*Douglas Dynamics, LLC v. Buyers Prods. Co.,*
717 F.3d 1336 (Fed. Cir. 2013)...........................................................................18

*Duncan Parking Techs. v. IPS Grp.,*
914 F.3d 1347 (Fed. Cir. 2019).............................................................................5

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006)..............................................................................23, 24, 25

*Genband US LLC v. Metaswitch Networks Corp.,*
861 F.3d 1378 (Fed. Cir. 2017)...........................................................................20

*Grain Processing Corp. v. Am. Maize-Prods. Co.,*
185 F.3d 1341 (Fed. Cir. 1999)...........................................................................17

*Heil Trailer Int'l v. Kula*,
542 F. App'x 329 (5th Cir. 2013) ....................28

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*,
49 F.3d 1551 (Fed. Cir. 1995)....................9

*Hybritech Inc. v. Abbott Lab'ys*,
849 F.2d 1446 (Fed. Cir. 1988)....................24

*In re BRCA1- & BRCA2-Based Hereditary Cancer Test Pat. Litig.*,
774 F.3d 755 (Fed. Cir. 2014)....................16

*In re Mahurkar Pat. Litig.*,
831 F. Supp. 1354 (N.D. Ill. 1993) ....................21

*Koninklijke Philips N.V. v. Zoll Med. Corp.*,
656 F. App'x 504 (Fed. Cir. 2016) ....................6

*Mallet & Co. v. Lacayo*,
16 F.4th 364 (3d Cir. 2021) ....................26

*Mead Johnson & Co. v. Abbott Lab'ys*,
201 F.3d 883 (7th Cir. 2000) ....................26

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
848 F.3d 1358 (Fed. Cir. 2017)....................4, 8

*Mitek Sys. v. United Servs. Auto. Ass'n*,
139 F.4th 1340 (Fed. Cir. 2025) ....................6

*Natera, Inc. v. NeoGenomics Labs., Inc.*,
106 F.4th 1369 (Fed. Cir. 2024) ....................10, 25

*Novartis Pharms. Corp. v. Eon Labs Mfg.*,
363 F.3d 1306 (Fed. Cir. 2004)....................6

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
575 F.2d 1152 (6th Cir. 1978) ....................13

*Potato Ventures LLC v. P'ship & Unincorporated Ass'n Identified on Schedule A*,
No. 25-2312-DDC-RES, 2025 WL 2256204 (D. Kan. Aug. 7, 2025)....................14

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l*,
711 F.3d 1348 (Fed. Cir. 2013)....................14

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l*,
843 F.3d 1315 (Fed. Cir. 2016)....................5, 6

*Richert v. Calderin*,
No. 24-cv-21901-ALTMAN, 2025 WL 263454 (S.D. Fla. Jan. 22, 2025) ..........................7

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
659 F.3d 1142 (Fed. Cir. 2011)..........................................................................12

*RoDa Drilling Co. v. Siegal*,
552 F.3d 1203 (10th Cir. 2009) ..........................................................................18

*Spath v. Hayes Wheels Int'l-Ind., Inc.*,
211 F.3d 392 (7th Cir. 2000) ..............................................................................7

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
883 F.2d 1573 (Fed. Cir. 1989)..........................................................................13

*Tek Global, S.R.L. v. Sealant Sys. Int'l*,
920 F.3d 777 (Fed. Cir. 2019)..............................................................................5

*Tinnus Enter. v. Telebrands Corp.*,
846 F.3d 1190 (Fed. Cir. 2017)............................................................................4

*Travel Tags, Inc. v. UV Color, Inc.*,
690 F. Supp. 2d 785 (D. Minn. 2010)..................................................................15

*Trebro Mfg., Inc. v. FireFly Equip., LLC*,
748 F.3d 1159 (Fed. Cir. 2014)..........................................................................11

*UATP IP, LLC v. Kangaroo, LLC*,
No. 2022-2047, 2024 WL 658205 (Fed. Cir. Feb. 16, 2024) .........................................3, 4

*United States v. Rare Breed Triggers, LLC*,
690 F. Supp. 3d 51 (E.D.N.Y. 2023) ....................................................................1

*Voile Mfg. Corp. v. Dandurand*,
551 F. Supp. 2d 1301 (D. Utah 2008)..................................................................15

*Windsurfing Int'l Inc. v. AMF, Inc.*,
782 F.2d 995 (Fed. Cir. 1986)............................................................................23

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008)............................................................................................4, 25

*Yale Lock Mfg. Co. v. Sargent*,
117 U.S. 536 (1886)..........................................................................................14

**STATUTES** **Page(s)**

28 U.S.C. § 517 ........................................................................................................25

35 U.S.C. § 271 ........................................................................................................5, 6

35 U.S.C. § 284 ........................................................................................................12

**RULES** **Page(s)**

Fed. R. Civ. P. 65 ........................................................................................................26

# I. BACKGROUND

Plaintiffs Rare Breed Triggers, Inc. ("Rare Breed") and ABC IP, LLC ("ABC") filed a consolidated motion ("PI Mot."[1]) for a preliminary injunction ("PI") in over a dozen cases based on alleged infringement of several asserted patents directed to forced reset trigger ("FRT") technology: U.S. Patent 12,031,784 ("'784 Patent," Dkt. #10-13), U.S. Patent 12,038,247 ("'247 Patent," Dkt. #10-10), U.S. Patent 12,529,538 ("'538 Patent," Dkt. #10-12), U.S. Patent 12,578,159 ("'159 Patent," Dkt. #10-11), and U.S. Patent 12,636,403 ("'403 Patent," Dkt. #10-14). The requested injunction would reach Defendants' products, even though Defendants[2] dispute infringement and validity and Plaintiffs have not yet proven any asserted claim. Indeed, Plaintiffs obtained one of the asserted patents (the '538 Patent) from an individual who stole the invention from its true inventor. (*See* accompanying Declaration of Timothy S. Hoffman ¶¶ 2, 14-23.)

Rare Breed's start in the FRT market (including all of their shenanigans) was well-documented in *United States v. Rare Breed Triggers, LLC*, 690 F. Supp. 3d 51 (E.D.N.Y. 2023). That includes the utter disregard and disrespect for the law by their star witness here, Lawrence DeMonico, and repeated findings of his lack of credibility. *Id.* at 68-73, 91-93, 99-101, 103 & n.39, 110-11, 114-18. Rare Breed first launched an FRT product at the end of 2020. (DeMonico Decl., Dkt. #7-2, ¶10.) After Rare Breed resolved certain issues with the Department of Justice in

---

[1] Plaintiffs filed the PI Motion as Dkt. #7 in *In re: Rare Breed Triggers Patent Litig.*, No. 4:26-md-03176-ALM (E.D. Tex.). It was supported, *inter alia*, by the Eichmann Declaration (Dkt. #7-1), the DeMonico Declaration (Dkt. #7-2 to #7-26), the Luettke Declaration (Dkt. #8), and the Colvin Declaration (Dkt. #9 and #10). Plaintiffs subsequently filed copies of the PI Motion and supporting documents in the affected cases. For consistency, this Opposition will cite to the documents filed in case No. 4:26-cv-md-03176-ALM, unless otherwise indicated.

[2] This Opposition is submitted on behalf of the following: 80Mills LLC d/b/a Tactical Titan Supply ("80Mills"), Pearson Gardner; DNT LLC d/b/a Deez Nutz Tactical ("DNT"), Zach Morrow; Hanes Tactical LLC ("Hanes"), Damion Terrell Bennett; Harrison Gunworks LLC ("Harrison"), Tyler Harrison; Steven Thanh Nguyen d/b/a Polymer Pew ("Polymer Pew"); and Z3 Productions LLC d/b/a Z3Pro ("Z3") (all collectively, "Defendants").

May 2025, Rare Breed re-launched the FRT-15L3 at a $499 price point. (*Id.* at ¶¶ 58, 61.) By that time, however, the FRT market was no longer the market Rare Breed had entered in 2020. Rare Breed itself states that, by the May 2025 DOJ settlement, it had identified approximately seventy companies selling FRT products, most derived from publicly released Hoffman Tactical design files, and that additional sellers continued to appear. (*Id.* at ¶58.)

Defendants are small businesses that sell, or until recently sold, modular fire-control components to a do-it-yourself ("DIY") customer base. Those products include the accused Super Safety, ARC-Fire, MARC Selector, and Super Selektor systems,[3] as well as platform-compatibility products and related components. The Super Safety uses a push-button mechanism, while the ARC-Fire and the Selector use a rotating selector to choose firing mode in a manner familiar to users of standard AR-pattern rifles.

The accused products differ from Rare Breed's products in ways relevant to customer demand. Rare Breed's FRT-15L3 is a closed, drop-in assembly. By contrast, the accused ARC-Fire, Selector, and Super Safety kits supply only certain components—such as the cam, reset lever, and, for the ARC-Fire or Selector, safety selector components—and do not include items such as the hammer, disconnector, and pins. This allows customers to reuse existing parts and to install, service, or later upgrade the trigger of their choice, including higher-end or different-style third-party triggers. (*See* accompanying Declaration of Tyler Harrison ("Harrison Decl.") ¶5; accompanying Declaration of Zach Morrow ("Morrow Decl.") ¶4; accompanying Declaration of Pearson Gardner ("Gardner Decl.") ¶¶ 4-5; accompanying Declaration of Steven Thanh Nguyen

[3] Plaintiffs' PI Motion (§§ II.C.2.a-b) refers to the MARC Selector, the Super Selektor, and the Atrius Selector (another product that none of the Defendants are accused of infringing) generically and interchangeably, even though there are certain differences among these products sold by DNT and Harrison Gunworks. Thus, this Opposition will likewise treat these products as materially identical, referring to them as the "Selector."

("Nguyen Decl.") ¶¶ 4-5; accompanying Declaration of Damion Terrell Bennett ("Bennett Decl.") ¶¶ 4-5; accompanying Declaration of Ari Bytyqi ("Bytyqi Decl.") ¶¶ 4-5 (collectively, "Defendants' Declarations").)

Plaintiffs' own evidence shows that Rare Breed knew of Defendants' accused products by April 1, 2025, at the latest, as shown by the cease-and-desist letters sent by Rare Breed's counsel. (Dkt. #7-15 through #7-20.) Defendants responded, disputing infringement, and continued selling. (*See, e.g., ABC IP, LLC v. DNT LLC*, No. 4:26-cv-00377-ALM (E.D. Tex.), Dkt. #28-1.) Plaintiffs then sued each of the Defendants in June 2025. Yet Plaintiffs nevertheless did not seek preliminary injunctive relief against Defendants until May 28, 2026, *fourteen months* after their alleged notice and cease-and-desist letters and basically a *year* after filing suit.

Plaintiffs' aggregated, one-size-fits-all showing fails to establish irreparable harm as to any Defendant, the PI Motion fails to show a likelihood of success on the merits, the balance of harms tips sharply against the requested relief, and the public interest favors denial. Judge Rankin's decision denying these same Plaintiffs the same preliminary relief on materially similar irreparable-harm theories—about FRT products—in *ABC IP, LLC v. Peak Tactical, LLC*, No. 26-CV-18-R, Dkt. #39 (D. Wyo. Feb. 13, 2026), appeal docketed, No. 26-1527 (Fed. Cir.), charts the correct course.[4]

## II. <u>APPLICABLE LAW</u>

A request for a PI is generally governed by regional circuit law. But the Federal Circuit has itself built a body of precedent applying the general considerations to patent cases and gives dominant effect to that precedent insofar as it reflects considerations specific to patent issues. *UATP IP, LLC v. Kangaroo, LLC*, No. 2022-2047, 2024 WL 658205, at *1 (Fed. Cir. Feb. 16,

[4] The *Peak Tactical* action has since been transferred into this MDL as No. 4:26-cv-00698-ALM.

2024) (citing *Tinnus Enter. v. Telebrands Corp.*, 846 F.3d 1190, 1202-03 (Fed. Cir. 2017)). A PI "is an extraordinary remedy never awarded as of right." *Id.* at *2 (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008)). A party seeking a PI must clearly establish (1) likelihood of success on the merits, (2) irreparable harm in the absence of a PI, (3) the balance of hardships tipping in its favor, and (4) the PI is in the public interest. *Winter*, 555 U.S. at 20, 22.

On likelihood of success, the patentee must show that it will likely prove infringement and that it will likely withstand any challenges to the validity of the patent. An accused infringer need only demonstrate a substantial question of validity or infringement to defeat a likelihood of success on the merits. *Tinnus Enter.*, 846 F.3d at 1202. Unlike proving invalidity at trial, an accused infringer "need not, to defeat a preliminary injunction, prove invalidity by clear and convincing evidence . . . ." *BlephEx, LLC v. Myco Indus.*, 24 F.4th 1391, 1399 (Fed. Cir. 2022); *see also Tinnus Enter.*, 846 F.3d at 1205 (the burden to show a substantial question of invalidity at the PI stage is lower than what is required to prove invalidity at trial).

The patentee must also establish that it is likely to suffer irreparable harm (absent the PI) and that there is a causal nexus between the alleged harm and the alleged infringement. *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017)*; see also Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1361 (Fed. Cir. 2013) (the causal-nexus requirement distinguishes between irreparable harm caused by infringement and irreparable harm caused by otherwise lawful competition). On the balance of hardships, a court weighs the harm to the movant if the PI is not granted against the harm to the non-movant if the PI is granted. *Metalcraft*, 848 F.3d at 1369.

## III. DISCUSSION

### A. Plaintiffs Cannot Establish a Strong Likelihood of Success on the Merits.

As an initial matter, it is not clear from the pleadings what specific causes of action Plaintiffs are actually asserting and against what products. For example, the currently operative complaint against 80Mills includes one count of indirect infringement and two counts of direct infringement. (*ABC IP, LLC v. 80Mills LLC*, No. 4:26-cv-00380 (E.D. Tex.), Dkt. #26 at p. 11-32). But the proposed amended complaint scraps that approach, replacing it with five counts, each of which asserts direct, induced, "and/or" contributory infringement of one of five patents. (*See id.*, Dkt. #39 at p. 10-62). Furthermore, those counts (which are asserted against several different products) assert infringement "literally and/or under the doctrine of equivalents." (*See id.*).

Proving direct infringement (under 35 U.S.C. §271(a)) requires a patentee to establish that one or more patent claims read on the accused product literally or under the doctrine of equivalents (i.e., that the product embodies each claim limitation literally or its equivalent). *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005); *Tek Global, S.R.L. v. Sealant Sys. Int'l*, 920 F.3d 777, 784 (Fed. Cir. 2019). That analysis entails two steps: (1) determining the meaning and scope of the asserted claims (i.e., claim construction), and (2) comparing the construed claims to the accused products. *Duncan Parking Techs. v. IPS Grp.*, 914 F.3d 1347, 1360 (Fed. Cir. 2019).

Proving induced infringement (under §271(b)) requires a patentee to establish that (1) a third party directly infringed the asserted claims (i.e., underlying direct infringement), (2) the defendant induced those infringing acts (i.e., causation), and (3) the defendant knew the acts it induced constituted infringement (i.e., intent). *Power Integrations, Inc. v. Fairchild Semiconductor Int'l*, 843 F.3d 1315, 1332 (Fed. Cir. 2016); *Alpek Polyester, S.A. v. Polymetrix*

*AG*, No. 2021-1706, 2021 WL 5974163, at *8 (Fed. Cir. Dec. 16, 2021). The second step requires the inducer to take an affirmative act to encourage infringement. *Power Integrations*, 843 F.3d at 1332.

The Federal Circuit has discussed contributory infringement (under §271(c)) using several different formulations. Synthesizing them, the required elements are: (1) an act of direct infringement, (2) the defendant knew that the combination for which its component was especially made was both patented and infringing (i.e., knowledge of the patent and knowledge of infringement), (3) the defendant's component is not a staple article of commerce suitable for substantial non-infringing uses, and (4) the component is a material part of the patented invention. *Cross Med.*, 424 F.3d at 1312; *Mitek Sys. v. United Servs. Auto. Ass'n*, 139 F.4th 1340, 1351 (Fed. Cir. 2025); *Koninklijke Philips N.V. v. Zoll Med. Corp.*, 656 F. App'x 504, 522 (Fed. Cir. 2016); *see also Commil USA, LLC v. Cisco Sys.*, 575 U.S. 632, 639 (2015). "[T]here can be no inducement or contributory infringement absent an underlying direct infringement." *Novartis Pharms. Corp. v. Eon Labs Mfg.*, 363 F.3d 1306, 1308 (Fed. Cir. 2004). If a defendant reasonably believes that he does not infringe (e.g., by reading the claims differently from the plaintiff), that defendant is not liable for indirect infringement, even if his reading is ultimately wrong. *See Koninklijke Philips*, 656 F. App'x at 523 (citing *Commil*, 575 U.S. at 642).

The PI Motion dedicates just a few pages to the likelihood-of-success factor, to discuss the applicable legal standards, claim construction, infringement of five patents by multiple products, and the patents' validity. (*See* PI Mot. at 23-29). To say that the discussion is sparse is a severe understatement; the PI Motion does not go through each element of each claim and compare it against each accused product (as required to show direct infringement). The conclusory and undeveloped nature of the infringement arguments alone justifies denying the PI Motion. *See*

*Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000).

Instead, the PI Motion offloads the discussion to *exhibits* of one of the supporting declarations. (*See* PI Mot. at 24 (citing Dkt. #8-1 to #8-13)). This effective incorporation by reference is a transparent attempt to circumvent the page limits. *See Richert v. Calderin*, No. 24-cv-21901-ALTMAN, 2025 WL 263454, at *1 (S.D. Fla. Jan. 22, 2025). Plaintiffs requested leave to increase their PI Motion from 15 pages to 40. (*See* Dkt. #12.) But incorporating the 21-page Luettke Declaration (Dkt. #8) and its *thirteen* exhibits results in a whopping 507 pages (!) added to the PI Motion's already increased 40 pages. Plaintiffs neither requested nor received permission for such an increase. If the Court does not deny the PI Motion for its failure to show – within the motion itself – likelihood of success on the merits, then Defendants' non-infringement and invalidity response must also largely rely on their expert's declaration.

And for the detailed reasons explained in the accompanying declaration of Dr. Stephen A. Batzer ("Batzer Decl."), the accused products do not infringe the asserted claims of the '784 Patent, the '247 Patent, the '159 Patent, and the '403 Patent. (Batzer Decl. §§ VII.A-D.) Moreover, as thoroughly explained by Dr. Batzer, the asserted claims of each asserted patent are invalid. (*Id*. at §§ VIII.A-E.) These substantial questions regarding infringement and invalidity of the asserted claims eliminate Plaintiffs' likelihood of success on the merits, which alone justifies denying the PI Motion.

### B. <u>Plaintiffs Have Not Carried Their Burden To Show Irreparable Harm as to Any Defendant</u>.

#### 1. Plaintiffs' Aggregated, One-Size-Fits-All Showing Cannot Support Defendant-Specific Relief.

A preliminary injunction runs against particular parties, and the movant must therefore establish irreparable harm caused by the party to be enjoined. *Apple Inc. v. Samsung Elecs. Co.*,

678 F.3d 1314, 1324–25 (Fed. Cir. 2012); *Metalcraft*, 848 F.3d at 1368. Plaintiffs' consolidated presentation does the opposite: it aggregates thirteen defendant groups—and, in substance, an entire market Plaintiffs say contains "over 100" infringing sellers with "new entrants appearing weekly" (PI Mot. at 34; DeMonico Decl. ¶58)—into a single undifferentiated harm narrative. Nowhere do Plaintiffs identify a single sale diverted to 80Mills, DNT, Hanes, Harrison, Polymer Pew, or Z3; the volume of any Defendant's accused sales; any Defendant's share of the market; or any price, share, or reputational effect attributable to any Defendant specifically. Mr. Eichmann's economic declaration and Mr. DeMonico's fact declaration speak of "Defendants" and "competing products" in the aggregate. A market-wide grievance against a hundred-plus sellers is not evidence that any of these six Defendants is causing Rare Breed irreparable injury, and the causal-nexus requirement forecloses attributing market-wide competitive pressure to individual defendants. (*See* accompanying Declaration of Eric J. Phillips ("Phillips Decl.") ¶15 & n.20, ¶¶ 52–53.)

That defect is not a technicality. Each Defendant here is, in substance, a one-person operation: 80Mills, DNT, Hanes, Harrison, Polymer Pew and Z3 are recently formed limited liability companies. (PI Mot. at 8–17; Defs.' Decls. ¶¶ 2–3.) And two of the six are not selling accused products at all: 80Mills has suspended its accused sales, and Hanes has ceased selling accused products. (Gartner Decl. ¶15; Bennett Decl. ¶15.) Plaintiffs cannot demonstrate imminent, irreparable harm flowing from defendants who are making no sales. Plaintiffs' own theory is that the harm they describe is the product of the entire field of competitors—a field seeded by Hoffman Tactical's free public release of design files before Rare Breed even re-entered the market. (PI Mot. at 1–2.) On that record, enjoining these six Defendants would not stop the alleged harm; it would simply destroy six businesses while the market-wide conditions Plaintiffs complain of

continue unabated. That mismatch between the claimed injury and the requested remedy is fatal to the irreparable-harm showing as to each Defendant.

**2. Plaintiffs' Fourteen-Month Delay Defeats Any Claim of Emergency Relief.**

Plaintiffs' own evidence shows that Rare Breed knew of each Defendant's accused sales by, at the latest, the end of March 2025. Rare Breed sent cease-and-desist letters identifying the '247 Patent to Hanes and Harrison on March 28, 2025; to 80Mills, DNT, and Polymer Pew on March 31, 2025; and to Z3 on April 1, 2025. (Dkt. #7-15 through #7-20.) Plaintiffs filed suit against each Defendant in June 2025. Yet Plaintiffs did not move for preliminary relief until May 28, 2026—fourteen months after their asserted notice and cease-and-desist letters, and roughly a year after filing their complaints. That delay is incompatible with the urgent, imminent, non-compensable harm required for preliminary relief. "[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction," and, absent a good explanation, delay "militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995).

Plaintiffs anticipate the point, conceding a delay of "three to 11.5 months" measured from the filing of the complaints and offering a footnote of excuses. (PI Mot. at 29 n.9.) Each fails. Measured properly from Plaintiffs' own asserted notice—the March and April 2025 cease-and-desist letters—the delay as to these six Defendants is fourteen months, and even on Plaintiffs' preferred complaint-filing metric, each of these Defendants sits at the very top of Plaintiffs' own range. Nor can Plaintiffs invoke resource limitations or the JPML proceedings. Plaintiffs boast that they have filed more than forty-five patent infringement actions since May 2025 (PI Mot. at 21; DeMonico Decl. ¶17)—a record demonstrating they were fully capable of pursuing whatever relief

they chose, whenever they chose. And when Plaintiffs actually perceived urgency, they moved fast: they sued the Hoffman Defendants on December 23, 2025 and obtained a TRO three weeks later, on January 13, 2026 (PI Mot. at 21); they sought a TRO and PI against Peak Tactical the *next day* after filing that action in January 2026, *see Peak Tactical*, Dkt. #39 at 1–2. Even in the *AS Designs* case, in which Plaintiffs moved for a PI *months* after filing suit, that PI motion was filed a full month before this PI Motion, while the JPML transfer process was ongoing. (*See Rare Breed Triggers, Inc. v. AS Designs, LLC*, No. 4:26-cv-00370-ALM (E.D. Tex.), Dkt. #28 (Apr. 27, 2026).) The JPML did not order centralization until April 2, 2026 (PI Mot. at 22); it does not explain why Plaintiffs sat on their claimed emergency throughout the second half of 2025 and the first half of 2026 as to these Defendants. Plaintiffs cannot reconcile their claimed existential emergency with fourteen months of deliberate inaction while they litigated dozens of other cases. The delay alone weighs heavily against the extraordinary interim remedy Plaintiffs now seek.

Nor can Plaintiffs reset the clock by pointing to the recent issuance of their newest continuation patents. Delay is not measured from before a patent issues, *Apple*, 678 F.3d at 1325, but the converse is equally true: Plaintiffs held issued patents—including the '247 Patent identified in every cease-and-desist letter—throughout the fourteen months they must now explain, and the irreparable harms they allege (durable-goods displacement, price erosion, market-share loss) are the same harms, from the same accused products, that Plaintiffs identified in March 2025. A patentee that tolerates known conduct for over a year under issued patents claiming the same technology cannot manufacture urgency by adding later-issued members of the same family to the same campaign. *Natera, Inc. v. NeoGenomics Labs., Inc.* is not to the contrary: there the patentee moved within months of the issuance of the only asserted patent. 106 F.4th 1369, 1380 (Fed. Cir. 2024). Here the enforcement campaign, the accused conduct, and the claimed harms all long

predate the newest patents, and the harm theory Plaintiffs advance is indifferent to which family member is asserted.

### 3. Plaintiffs' Durable-Goods and Lost-Sales Theories Show, At Most, a Damages Case.

Plaintiffs' central irreparable-harm theory is that FRT products are durable goods, that each accused sale displaces a Rare Breed sale, and that each displaced customer is lost for the life of the product. (PI Mot. at 29–30; Eichmann Decl. ¶¶ 10–14; Luettke Decl. ¶¶ 65–68.) Accepting that framing for purposes of this factor does not establish irreparable harm; it identifies a finite, measurable lost-sales claim. The Federal Circuit has squarely held that "lost sales standing alone are insufficient to prove irreparable harm." *Automated Merch. Sys., Inc. v. Crane Co.*, 357 F. App'x 297, 300 (Fed. Cir. 2009). If lost sales alone were enough, irreparable harm would exist in every manufacturer-patentee case. *Id.* at 300–01. Judge Rankin rejected this same essential theory—advanced by these same Plaintiffs, about these same FRT products—in *Peak Tactical*. There, Plaintiffs argued that Defendants' own three-year sales projections proved permanent lost business opportunities in a durable-goods market, supported by the same style of expert declaration Plaintiffs offer here. Judge Rankin held that "lost sales standing alone are insufficient to prove irreparable harm," that lost sales "are presumed to be compensable through damages," and that "no amount of lost revenue alone may support a finding of irreparable harm." *Peak Tactical*, Dkt. #39 at 10–11 (quoting *Automated Merch. Sys.*, 357 F. App'x at 300–01). This Court should reach the same conclusion.

Nor can Plaintiffs avoid that rule by re-labeling their computable losses as permanently lost "market share" or "customers." In *Trebro Manufacturing, Inc. v. FireFly Equipment, LLC*, 748 F.3d 1159, 1170–71 (Fed. Cir. 2014), the movant proved head-to-head lost sales to the accused infringer in a market of roughly fifteen to twenty machines per year, where each identified sale

was traceable to the defendant before the court. Nothing of the kind exists here: Plaintiffs identify no diverted sale, no lost customer, and no share point attributable to any of these six Defendants, and their own economist is careful to assert displacement only "as a matter of economic theory." (Eichmann Decl. ¶11; Phillips Decl. ¶15 & n.20, ¶¶ 18, 65.) Likewise, *Robert Bosch LLC v. Pylon Manufacturing Corp.*, 659 F.3d 1142, 1155–56 (Fed. Cir. 2011), was a permanent-injunction appeal following a jury verdict of infringement, and its observation that a damages award must be "meaningful in light of the financial condition of the infringer" presupposes record evidence of that condition—evidence Plaintiffs have not offered as to any Defendant, and that their inflated related-party royalty figure cannot supply. *See infra* §III.B.7.

The record makes Plaintiffs' alleged damages more calculable, not less. Plaintiffs themselves quantify the claimed injury: they identify their retail prices, Defendants' prices, the percentage "undercut" for each accused product category, and a combined per-unit "loss" of "$325 to $420 in profit on each displaced sale." (PI Mot. at 31, 35; DeMonico Decl. ¶59.) A theory that reduces the claimed harm to a per-unit dollar figure is the paradigm of a compensable injury. Defendants' sales are not anonymous free downloads; they are traceable commercial transactions conducted through identified websites and channels, with transaction records available in discovery. Accused units sold, but-for sales, margins, royalties, and any proven price effect are precisely the inputs of an ordinary patent-damages model under 35 U.S.C. § 284. (Phillips Decl. ¶¶ 15–17, 22–23.) The problem for Plaintiffs is not evidentiary impossibility; it is that they prefer preliminary market exclusion to proving recoverable patent damages.

Plaintiffs' proffered expert, Mr. Luettke, opines that the accused products deliver "substantially similar forced-reset trigger functionality" to Rare Breed's FRT products and that he is aware of no non-infringing alternatives. (Luettke Decl. ¶¶ 59–64, 68.) Far from making damages

unknowable, those opinions supply the very inputs of a conventional lost-profits analysis under *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978): demand for the patented functionality, the asserted absence of acceptable non-infringing substitutes, Rare Breed's manufacturing capacity, and Plaintiffs' own per-unit profit figures. (PI Mot. at 31, 35; DeMonico Decl. ¶59; Phillips Decl. ¶¶ 17–23.) And to the extent Plaintiffs point to the many other sellers in the market, the Federal Circuit's market-share approach permits a patentee to recover lost profits in proportion to its market share. *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577–78 (Fed. Cir. 1989). The market Plaintiffs describe is the paradigm case for an adequate damages remedy, not for preliminary market exclusion.

The durable-goods premise is also self-defeating and factually wrong. If the relevant demand opportunity were truly "exhausted" by a single sale, there would be no follow-on sales to lose beyond that one identifiable sale—a point Plaintiffs' own technical expert confirms (Luettke Decl. ¶67 (a purchaser "is unlikely to need to purchase a replacement or additional unit for the same rifle"))—and Plaintiffs' lost sales would be straightforward to identify and quantify as lost profits. (Phillips Decl. ¶15.) And the premise is contradicted by the market: customers commonly switch FRT products—because of product failures, preferences in trigger feel, shape, and look, functionality differences, curiosity, and spur-of-the-moment purchasing—with insignificant switching costs, and repeat purchasing is common. (Defs.' Decls. ¶¶ 6–7, 11.) Because Plaintiffs seek a permanent injunction as final relief, even on their own theory any customers supposedly "removed" from the market would be returned to it at judgment—with Rare Breed positioned, on Plaintiffs' own account of its patent rights, to capture those sales. (Phillips Decl. ¶24.)

Mr. Eichmann's market framing is also internally inconsistent. He describes a fast-moving market in which competing products can displace one another over a relatively short period of

time, yet he assumes that if Defendants were later enjoined, Rare Breed could not regain customers or market share. (Eichmann Decl. ¶¶ 6–7; Phillips Decl. ¶¶ 13, 24, 27.) Plaintiffs cannot rely on a rapidly shifting market when describing competitive harm, then insist that the same market becomes permanently immovable when assessing the adequacy of monetary relief and a permanent injunction at judgment. On Plaintiffs' own characterization, final relief would allow Rare Breed to regain any lost share over that same short period.

#### 4. Plaintiffs' Price-Erosion Theory Is Calculable and Market-Wide—Not Attributable to These Defendants.

Price erosion is a damages theory. "Lost revenue caused by a reduction in the market price of a patented good due to infringement is a legitimate element of compensatory damages." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l*, 711 F.3d 1348, 1378 (Fed. Cir. 2013); *see Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1357 (Fed. Cir. 2001) (quoting *Yale Lock Mfg. Co. v. Sargent*, 117 U.S. 536, 551 (1886)). Plaintiffs identify the alleged price change: Rare Breed reduced the FRT-15L3 price from $499 to $450 in August 2025. (PI Mot. at 32; Eichmann Decl. ¶25; DeMonico Decl. ¶61.) A known but-for price, a known reduced price, and identifiable unit volumes make any proven price erosion calculable—not irreparable. (Phillips Decl. ¶¶ 30–31.)

Judge Rankin rejected the same Rare Breed price-erosion presentation in *Peak Tactical*, holding that "[f]lat assertions of price erosion with no supporting market analysis are insufficient to demonstrate irreparable harm," and that Plaintiffs had not shown price erosion was non-compensable because any proven erosion can be addressed "by applying Plaintiffs' pre-litigation market price to the lost units." *Peak Tactical*, Dkt. #39 at 11–14; *see also Potato Ventures LLC v. P'ship & Unincorporated Ass'n Identified on Schedule A*, No. 25-2312-DDC-RES, 2025 WL 2256204, at *9 (D. Kan. Aug. 7, 2025) (no irreparable harm where plaintiff presented no sales data

or market-share evidence before and after the accused entry); *Voile Mfg. Corp. v. Dandurand*, 551 F. Supp. 2d 1301, 1307 (D. Utah 2008) ("Courts require more than unsupported factual conclusions to support" a finding of irreparable harm); *Travel Tags, Inc. v. UV Color, Inc.*, 690 F. Supp. 2d 785, 800 (D. Minn. 2010) (declaration assuming the defendant's prices "were solely responsible for [plaintiff's] price erosion" insufficient). There, as here, Plaintiffs alluded to a price discrepancy but offered no analysis of whether or how any price movement harmed their business and no sales data before or after the accused entry. *Peak Tactical*, Dkt. #39 at 12–13. The same defect defeats the same theory again.

Plaintiffs also cannot tie the August 2025 price reduction—or any "anchoring" of customer expectations—to these Defendants. Plaintiffs' own narrative attributes the reduction to "the influx of competing infringing products" generally. (PI Mot. at 31–32; Eichmann Decl. ¶25; DeMonico Decl. ¶61.) By Plaintiffs' own account, low-priced Super Safety-type products built from Hoffman Tactical's freely released design files saturated the market before Rare Breed re-launched at $499 in May 2025, and the field has since swelled to more than one hundred sellers. (PI Mot. at 1–2, 34.) If cheaper competing products were dictating Rare Breed's pricing, Rare Breed would not have selected $499 as its re-launch price months after those products flooded the market, only to cut to $450 later. The later reduction reflects a pre-existing, market-wide competitive landscape—not the conduct of six small kit-and-component sellers, none of whom is alleged to hold any particular volume or share. A market-wide price response is not a defendant-specific irreparable harm, and the causal-nexus requirement forecloses attributing market-wide pricing pressure to these Defendants. *Apple*, 678 F.3d at 1324–25; (Phillips Decl. ¶15 & n.20, ¶¶ 42, 53).

Mr. Eichmann's fallback—that lower prices become embedded "reference points" that retrospective compensation cannot restore (PI Mot. at 32; Eichmann Decl. ¶¶ 25–26, 29)—fails

for the reasons Mr. Phillips explains. First, Plaintiffs have already identified the pre-reduction price ($499), which resolves any uncertainty about the but-for price and makes the differential calculable. Second, the "embedded expectations" theory contradicts Plaintiffs' own durable-goods premise: if each accused sale removes that customer from the addressable market for the life of the product, a post-judgment market would be populated largely by first-time buyers with no prior price anchor. Third, a victorious Rare Breed—on its own theory the lone patent-protected supplier—could set its profit-maximizing price. (Phillips Decl. ¶43.) None of this is irreparable.

#### 5. Plaintiffs' Market-Share, Dealer, Lead-Time, and Innovator-Reputation Theories Are Speculative and Not Defendant-Specific.

First, Plaintiffs' market-share evidence is not a reliable, defendant-specific showing. Mr. DeMonico offers a "good-faith estimate" that Rare Breed's share has fallen from "effectively 100%" at the FRT-15's 2020 launch to "less than 25%." (PI Mot. at 3.) That is not market analysis. It identifies no total market size, no Defendant's actual share, no customer diversion from any Defendant specifically, and no apportionment among the hundred-plus alleged infringers—or among lawful competitive forces. And the comparison baseline is wrong: "effectively 100%" describes the market position Rare Breed alleges it occupied when it launched in 2020, not the crowded field it re-entered after the May 2025 DOJ settlement, by which time—on Plaintiffs' own evidence—the market had been transformed by Hoffman's free design files and scores of sellers. (PI Mot. at 1–2, 34.) Any erosion from Rare Breed's 2020 peak long predated, and cannot be attributed to, these Defendants. Plaintiffs' market-share and price-erosion theories are also in tension with one another: there is "an inverse relationship between the potential for price erosion and loss of market share," because a patentee that lowers its price in response to competition preserves its share, and one that holds its price cannot claim erosion. *In re BRCA1- & BRCA2-Based Hereditary Cancer Test Pat. Litig.*, 774 F.3d 755, 765 n.27 (Fed. Cir. 2014); *see Peak*

*Tactical*, Dkt. #39 at 14–15. Plaintiffs cannot claim the maximum of both at once, and they have quantified neither.

Second, Plaintiffs' dealer "lock-in" theory supplies no defendant-specific proof either. Plaintiffs offer abstract assertions about dealer attention, training, compliance processes, and inventory investments, but identify no dealer investment attributable to any of these Defendants and no dealer relationship Rare Breed lost because of any Defendant. (Phillips Decl. ¶¶ 26–29.) In *Peak Tactical*, Judge Rankin found the analogous distribution-network theory "misplaced" and "increasingly attenuated" where—exactly as here—Plaintiffs presented no evidence of their own dealer network, no sales statistics, and no evidence of shifting dealer loyalty. *Peak Tactical*, Dkt. #39 at 14–15. Defendants' declarations confirm they have made no sales to East Valley Tactical, the one dealer Plaintiffs identify. (Defs.' Decls. ¶14; Phillips Decl. ¶29 & n.45.) And the theory is internally inconsistent: on Plaintiffs' own no-substitute premise, a post-judgment injunction would leave dealers with a single FRT source—Rare Breed—so the suggestion that dealers would refuse to revert and instead forgo all FRT sales makes no economic sense. (Phillips Decl. ¶28.)

Third, the lead-time theory fares no better. Rare Breed brought the first FRT product to market at the end of 2020—years before any Defendant here began selling accused products in 2024–2025. (PI Mot. at 5, 8–17.) Rare Breed already had, and exercised, the first-mover opportunity it now claims Defendants are taking away; the window it laments was closed by the DOJ enforcement action that shuttered its business for years and by Hoffman's public release of design files—not by these Defendants. (PI Mot. at 5, 21, 30–31.) In any event, lead-time and first-mover losses reduce to lost profits in a reconstructed but-for market—exactly what a lost-profits analysis recreates. *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999); (Phillips Decl. ¶25 & n.38).

Fourth, the reputational theories are unsupported. Plaintiffs' "innovator reputation" evidence consists of a single Facebook comment in which one commenter asked whether Rare Breed's FRT-15C3 was "based on the super safety." (PI Mot. at 33; DeMonico Decl. ¶66, Ex. W.) One stray social-media question—on Rare Breed's own page, which Rare Breed could and presumably did answer—is not evidence of irreparable reputational injury. Plaintiffs offer no customer survey, no dealer testimony, and no evidence of how any statement has actually affected public perception of the brand. Judge Rankin rejected the same type of showing in *Peak Tactical*: Plaintiffs presented evidence of negative online statements, but "no evidence of how these statements have impacted public perception of their brand," no showing that any claimed reputational injury flows from the underlying torts alleged rather than from other causes, and nothing beyond speculation—which "is not sufficient." *Peak Tactical*, Dkt. #39 at 15–17 (citing *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009)). Moreover, the record reflects that much of the online backlash Rare Breed has experienced is directed at Rare Breed's own cease-and-desist campaign and litigation strategy—criticism of Plaintiffs' enforcement conduct, not confusion caused by any Defendant's products. Plaintiffs cannot manufacture irreparable harm from the predictable consequences of their own enforcement strategy and then attribute it to six small defendants. And the premium-pricing/reputation variant (PI Mot. at 32–33) simply repackages the calculable price-erosion theory addressed above. (Phillips Decl. ¶¶ 48–49, 54–58.) Nor can the same theory be recast as a loss of "exclusivity." *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1344–45 (Fed. Cir. 2013), addressed a permanent injunction after infringement of valid claims had been adjudicated at trial; it did not relieve a preliminary-injunction movant of proving actual, defendant-specific irreparable injury, and at this stage—with no adjudication of infringement or validity, and substantial questions raised as to both in *Peak*

*Tactical*—the "exclusivity" label merely restates the lost-sales theory that *Automated Merchandising* and *Peak Tactical* hold insufficient.

**6. Product Differences and Market Segmentation Break Plaintiffs' Causal Chain.**

Plaintiffs' displacement narrative assumes the accused kits and components are fungible substitutes for Rare Breed's products and that every accused sale is a lost Rare Breed sale. Plaintiffs' own economic expert undermines that assumption by describing the FRT market as a differentiated niche market in which non-price factors—product design, perceived reliability, brand identity, and channel access—shape purchasing decisions. (Eichmann Decl. ¶¶ 6–7.) Those non-price attributes matter here, and they are largely unrelated to the asserted patent claims.

Defendants sell to a different market segment than Rare Breed. Rare Breed positions its products as premium, closed, drop-in assemblies sold at $450 to $620 under a no-discount policy. (PI Mot. at 6, 31.) Defendants' customers are DIY enthusiasts and tinkerers who affirmatively want lower-priced modular components that they can install, uninstall, reinstall, and combine with other parts—including higher-end or different-style third-party triggers—and who understand that Defendants' lower prices reflect the modular, install-it-yourself nature of the products. (Defs.' Decls. ¶¶ 8–10.) The modularity is itself a selling point: customers can later switch or upgrade trigger assemblies without replacing an entire drop-in unit. (*Id.* at ¶10.) A growing number of customers want two-stage triggers or the option to install one—something Rare Breed's single-stage FRT-15L3, the only product on which it claims a price reduction, does not offer. (*Id.* at ¶12.) And the Super Safety's push-button cam is a substantially different user interface from a standard selector; a reasonably knowledgeable customer immediately recognizes the difference and would not confuse whose product is installed. (*Id.* at ¶13.) Plaintiffs' own technical expert concedes the point in part, acknowledging "differences in form factor and installation method" between the

accused products and Rare Breed's assemblies. (Luettke Decl. ¶68.) Where non-price, non-patented features and distinct customer preferences drive demand, Plaintiffs cannot presume that every accused sale would otherwise have been a Rare Breed sale at Rare Breed's premium price, and the causal chain required for irreparable harm is broken. *Apple*, 735 F.3d at 1361; (Phillips Decl. ¶¶ 32–42, 65).

Nor is the causal nexus supplied by the bare fact that the accused products are accused of practicing the patents. The nexus inquiry has "little work to do" only where the accused product "contains no feature relevant to consumers' purchasing decisions other than what the patent claims." *Genband US LLC v. Metaswitch Networks Corp.*, 861 F.3d 1378, 1384 n.2 (Fed. Cir. 2017). Plaintiffs' own economist forecloses that premise here: he describes a "differentiated niche market rather than a commodity market" in which "product design, perceived reliability, brand identity, and access to distribution channels"—non-price attributes largely unrelated to the asserted claims—"play a central role in purchasing decisions." (Eichmann Decl. ¶¶ 6, 8; Phillips Decl. ¶13 & n.16, ¶42.) On Plaintiffs' own market description, price, modularity, installation preference, two-stage compatibility, and interface differences drive Defendants' sales—not the claimed reset feature standing alone.

**7. Plaintiffs' Cascading-Entry and Collectability Theories Are Speculative and Self-Defeating.**

Plaintiffs contend that denying preliminary relief will "invite" new infringers into the market. (PI Mot. at 34.) Their own record refutes the theory: Plaintiffs have filed more than forty-five patent-infringement actions since May 2025 and have already obtained a preliminary injunction against the Hoffman Defendants—the original source of the design files. (PI Mot. at 21.) A prospective entrant aware of that litigation campaign would conclude the opposite of what Plaintiffs suggest. Nor does the existence of other alleged infringers make damages incalculable;

it makes apportionment a routine damages exercise. *See In re Mahurkar Pat. Litig.*, 831 F. Supp. 1354 (N.D. Ill. 1993) (Easterbrook, J., sitting by designation) (each infringer may be held liable for market-wide price-erosion harm in proportion to the units it sold), *aff'd*, 71 F.3d 1573 (Fed. Cir. 1995); (Phillips Decl. ¶53). And the theory proves far too much: on Plaintiffs' logic, a patentee facing widespread infringement would be entitled to a preliminary injunction against any defendant it selects, without any defendant-specific showing at all.

The collectability theory is equally threadbare. Plaintiffs cite only Defendants' recent formation dates and the absence of publicly available financial information. (PI Mot. at 8–17, 34–35.) The absence of public financials is true of virtually every small private company in America; it is not an insolvency analysis, a review of financial records, or concrete evidence that any Defendant could not satisfy a judgment. Defendants are real businesses with real revenues and real margins. (Defs.' Decls. ¶¶ 20–21.)

Plaintiffs' per-unit arithmetic—that Plaintiffs "collectively lose $325 to $420 in profit on each displaced sale," such that no Defendant could ever pay a judgment (PI Mot. at 35)—rests on a damages figure Plaintiffs have inflated through internal self-dealing. The claimed per-unit "loss" is built on the $300-per-unit royalty that Plaintiff Rare Breed purports to pay its affiliate Plaintiff ABC on every FRT sold—a charge equal to roughly 67% of the FRT-15L3's $450 price. That royalty is not the product of an arm's-length negotiation: ABC and Rare Breed share common ownership and control, with the same principals on both sides of the license. As Mr. Phillips explains, a 67% royalty would be highly unusual and very unlikely to represent an arm's-length transaction; his review of comparable firearm-related license agreements in the RoyaltySource and ktMINE databases identified a median royalty rate of 4.5% of sales, and published industry benchmarks for the most analogous categories show average rates of 5.9% and third-quartile rates

of 6.4% to 7.2%. (Phillips Decl. ¶¶ 66–67 & Ex. 3.) At a market-based royalty, any likely judgment against any Defendant is a small fraction of Plaintiffs' inflated figure and well within Defendants' capacity to satisfy. (*Id.* ¶¶ 10, 68; Defs.' Decls. ¶20.) Plaintiffs cannot manufacture an inability-to-pay theory by first inflating damages with an affiliate royalty no arm's-length licensee would accept and then declaring the resulting number uncollectible. If Plaintiffs believe financial information is relevant, the proper course is damages discovery—not a business-ending injunction based on speculation.

For all these reasons, Plaintiffs have failed to establish likely irreparable harm as to any Defendant. That failure alone requires denial of the PI Motion as to Defendants. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1350 (Fed. Cir. 2001).

### C. <u>The Balance of Harms Favors Defendants.</u>

The balance of harms independently favors denial. On one side of the scale, Plaintiffs' alleged injuries are monetary, measurable, and remediable through a damages award if Plaintiffs ultimately prevail—as shown above, Plaintiffs themselves have reduced the claimed harm to a per-unit dollar figure. On the other side, the requested injunction would be existential for Defendants. Each Defendant is essentially a non-diversified, one-person business whose accused products and related firearm mechanisms are the core of its operations; an injunction would not trim a product line, it would threaten each company's existence—and each owner's livelihood—strand inventory, destroy sunk development and commercialization investments, and disrupt customer and supplier relationships before any merits determination. (Defs.' Decls. ¶¶ 2–3, 18–19, 21.) The court in *Peak Tactical* reached the same equitable conclusion on materially similar theories: because the requested remedy is "extreme," "the absence of evidence demonstrating irreparable harm lightens

Plaintiffs' proverbial scale—shifting the balance in favor of Defendants." *Peak Tactical*, Dkt. #39 at 31–32.

Plaintiffs' attempt to sort defendants into "infringement-built" businesses whose hardship deserves no weight (PI Mot. at 37–38) assumes the merits. A cease-and-desist letter is not a judgment, and no Defendant has been found to infringe any valid patent. Defendants disputed—and continue to dispute—infringement and validity in good faith. The Federal Circuit's *Windsurfing* line addresses parties who build businesses on products "found to infringe"; it does not create a categorical rule that an accused infringer's hardship is irrelevant before any adjudication. *Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) (emphasis added). The Supreme Court requires equitable balancing, not categorical rules. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393–94 (2006). Notably, Plaintiffs elected not to seek a TRO or prompt preliminary relief when they sent their letters in March 2025; having tolerated Defendants' disputed sales for at least fourteen months, Plaintiffs cannot now claim the equities demand that those same sales be halted overnight.

The requested injunction is also overbroad in ways that magnify the harm. Plaintiffs seek to enjoin not just complete devices but individual components—cams, levers, detents, springs, and pre-cut triggers—and "platform-extension" products, sweeping in items that do not themselves embody any asserted claim on Plaintiffs' own theory. (PI Mot. at 25–27.) Indeed, Mr. Luettke concedes that the additional fire-control parts included in bundled kits "are standard AR-pattern components." (Luettke Decl. ¶51.) Enjoining the sale of standard, staple firearm parts because they are bundled with an accused device magnifies the harm to Defendants without advancing any established patent right. And because the alleged harm is, by Plaintiffs' own telling, the product of more than one hundred sellers, an injunction against these six Defendants would deliver

Plaintiffs essentially none of the relief they claim to need—the market conditions would persist—while inflicting certain, immediate, and likely irreversible destruction on six one-person businesses, their owners, and their suppliers. (Defs.' Decls. ¶21.) A remedy that imposes maximal harm on the enjoined parties while providing minimal benefit to the movant is the antithesis of a favorable balance of hardships. The balance favors Defendants.

### D. The Public Interest Favors Denial of the Requested Injunction.

The public has an interest in enforcing valid patents, but that interest is not automatic and does not displace the traditional equitable test. *eBay*, 547 U.S. at 391–94. In patent cases, the public-interest inquiry focuses on whether a critical public interest would be injured by preliminary relief. *Hybritech Inc. v. Abbott Lab'ys*, 849 F.2d 1446, 1458 (Fed. Cir. 1988). Where, as here, Plaintiffs have not shown irreparable harm and the accused products are sold through traceable commercial channels, the public interest does not favor preliminary market exclusion. The public also has strong interests in competition, lawful commerce, consumer choice, and avoiding market exclusion based on unproven infringement allegations—before claim construction, merits discovery, expert discovery, or trial. *See Peak Tactical*, Dkt. #39 at 32–34 (finding the public interest did not weigh in favor of injunctive relief against accused FRT sellers on this same record of unproven irreparable harm).

The public interest in consumer choice is concrete here. Defendants' modular, serviceable, lower-priced products offer functional and consumer-choice differences—including the ability to reuse existing parts, select and upgrade preferred triggers (including two-stage triggers), and service one's own equipment—that Rare Breed's closed, non-serviceable drop-in units do not. (Defs.' Decls. ¶¶ 8–12.) Enjoining differentiated products before any merits adjudication would deprive consumers of those choices, and would do so in service of restoring the premium, no-

discount pricing structure Plaintiffs candidly say they wish to reestablish—pricing inflated by the $300 intercompany royalty ABC charges its own affiliate. (PI Mot. at 31–32; Phillips Decl. ¶¶ 66–67.) The public interest is not served by using a preliminary injunction to suppress price competition before the movant proves it is entitled to exclude anyone.

Plaintiffs' reliance on the DOJ settlement and the DOJ's Statement of Interest in *Hoffman* (PI Mot. at 39) does not change the analysis. The settlement may impose obligations on Rare Breed, but it does not bind Defendants, adjudicate Defendants' products, establish infringement or validity, or create a public-law entitlement to preliminary patent injunctions. At most it explains why Rare Breed chooses to enforce patents it believes are infringed; it does not relieve Plaintiffs of their burden under *Winter*, *eBay*, and *Natera*. Judge Rankin distinguished *Hoffman* on precisely the ground that matters here: the *Hoffman* defendants freely distributed infringing firearm design files to the public—conduct that risked "widespread copying, third-party manufacturing, and uncontrolled downstream infringement" and "expanding the infringement to potentially countless individuals"—whereas defendants who charge for physical products engage in traceable commercial transactions for which compensatory damages are available, and the DOJ filed no statement of interest. *Peak Tactical*, Dkt. #39 at 33–34. Defendants here, like the *Peak Tactical* defendants and unlike the *Hoffman* defendants, sell physical products through identified commercial channels; the DOJ has filed no statement of interest as to any of them. A statement of interest under 28 U.S.C. § 517, filed in a different case and addressed to different conduct, is not evidence, binds no party here, and cannot substitute for Plaintiffs' burden on the equitable factors.

Nor can Plaintiffs convert a private patent dispute into a safety determination. Plaintiffs maintain that FRTs are lawful semi-automatic products and sell FRTs as their entire business. (PI Mot. at 4–6.) They cannot claim the public is protected when Rare Breed sells FRTs but

endangered when competitors sell them, merely because Plaintiffs allege infringement. Plaintiffs' footnoted suggestion that DNT sells "defective" products (PI Mot. at 39 n.13) mischaracterizes ordinary discounted sales of cosmetically blemished, function-tested overstock parts—a routine practice in the firearms-components market—and Plaintiffs identify no safety incident attributable to any Defendant's product. (Morrow Decl. ¶22.) If independent regulatory or safety issues exist, they are for the appropriate regulators, not a substitute for Plaintiffs' burden.

Finally, the public interest is not served by a preliminary injunction that would effectively shut down six one-person businesses, harm their owners and suppliers, and reduce consumer choice—all while leaving untouched the hundred-plus other sellers whose presence, on Plaintiffs' own theory, is the true source of the market conditions Plaintiffs lament. Because Plaintiffs have not made the required showing, the public interest favors denial.

**E. <u>Any Injunction Would Require Substantial Security.</u>**

A court may issue a PI "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). While a PI should not be issued in this case (as explained above), a bond ensures at least some protection for Defendants if their conduct is wrongfully enjoined. *See Mallet & Co. v. Lacayo*, 16 F.4th 364, 390-91 (3rd Cir. 2021). Because a party injured by a wrongfully issued PI has no action for damages, its only recourse is the injunction bond, and courts should therefore "err on the high side" in setting security. *Id.* at 390–91; *Mead Johnson & Co. v. Abbott Lab'ys*, 201 F.3d 883, 888 (7th Cir. 2000). Plaintiffs' request that the Court require no security, or only nominal security (PI Mot. at 40), should be rejected out of hand: on this record, the requested injunction would eliminate substantially all of each Defendant's revenue. If the Court is inclined to enter any preliminary injunction against any

Defendant, it should require Plaintiffs to post security, for each enjoined Defendant, of no less than that Defendant's trailing twelve months of revenue from the enjoined product categories (or, for 80Mills and Hanes, the twelve months preceding the cessation of their sales)—approximately [redacted] plus additional security for stranded inventory, sunk development investment, and business-disruption costs.

**<u>CONCLUSION</u>**

In light of the substantial questions regarding the asserted patents' validity and infringement, Plaintiffs are unlikely to succeed on the merits. Plaintiffs have not shown likely irreparable harm. Plaintiffs waited some fourteen months after their own cease-and-desist letters to seek "emergency" relief. Their irreparable-harm showing is an aggregated, market-wide narrative that identifies no defendant-specific diversion, price effect, or reputational injury; their durable-goods, price-erosion, market-share, dealer, lead-time, and reputational theories are quantifiable, speculative, self-contradictory, or self-inflicted—and each has already been rejected on materially similar proof in *Peak Tactical*; and their collectability theory rests on a per-unit damages figure inflated by a related-party royalty no arm's-length licensee would accept. The balance of harms tips decisively against an injunction that would destroy six small, non-diversified businesses while providing Plaintiffs no meaningful relief from the market-wide conditions they describe, and the public interest favors competition, consumer choice, and adjudication on a complete record. The Consolidated Motion for Preliminary Injunction should be denied as to Defendants.

**HEARING**

Defendants respectfully request an evidentiary hearing on Plaintiffs' PI Motion. *See Heil Trailer Int'l v. Kula*, 542 F. App'x 329, 334 (5th Cir. 2013) (hearing required where facts are in dispute).

Respectfully submitted,

Dated: August 18, 2026

EMERSON, THOMSON & BENNETT, LLC
*/s/ John M. Skeriotis*
John M. Skeriotis (Ohio Bar # 0069263)
jms@etblaw.com
Sergey Vernyuk (Ohio Bar # 0089101)
sv@etblaw.com
1914 Akron-Peninsula Rd.
Akron, Ohio 44313
(330) 434-9999 – Telephone
(330) 434-8888 – Facsimile
*Attorneys for Defendants AS Designs, LLC, Matthew S. Karlovic, and Calvin Olson*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this Opposition and the Declarations of Pearson Gardner, Damion Terrell Bennett, Tyler Harrison, Zach Morrow, Ari Bytyqi, Steven Thanh Nguyen, and Eric Phillips is being served on August 18, 2026, on Plaintiffs' counsel via electronic mail:

Benjamin Christoff
christoff@fr.com

Carl E. Bruce
bruce@fr.com

Glenn D. Bellamy
gbellamy@whe-law.com

Matthew A. Colvin
colvin@fr.com

Melissa R. Smith
melissa@gillamsmithlaw.com

*/s/ John M. Skeriotis*
John M. Skeriotis (Ohio Bar # 0069263)
jms@etblaw.com
1914 Akron-Peninsula Rd.
Akron, Ohio 44313
(330) 434-9999 – Telephone
(330) 434-8888 – Facsimile

**LOCAL RULE CV-5(a)(7)(B) CERTIFICATION**

Pursuant to L.R. CV-5(a)(7)(B), I certify that a motion to seal this Opposition and the supporting Declarations of Pearson Gardner, Damion Terrell Bennett, Tyler Harrison, Zach Morrow, Ari Bytyqi, Steven Thanh Nguyen, and Eric Phillips has been filed.

*/s/ John M. Skeriotis*

John M. Skeriotis (Ohio Bar # 0069263)
jms@etblaw.com
1914 Akron-Peninsula Rd.
Akron, Ohio 44313
(330) 434-9999 – Telephone
(330) 434-8888 – Facsimile