[redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| In Re: Rare Breed Triggers Patent Litigation | 4:26-md-03176-ALM<br>MDL 3176 |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br>Plaintiffs,<br>v.<br>80MILLS LLC, d/b/a TACTICAL TITAN SUPPLY, and PEARSON GARDNER,<br>Defendants. | Civil Action No. 4:26-cv-00380-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br>Plaintiffs,<br>v.<br>DNT LLC, d/b/a DEEZ NUTZ TACTICAL, and ZACH MORROW,<br>Defendants. | Civil Action No. 4:26-cv-00377-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br>Plaintiffs,<br>v.<br>HANES TACTICAL, LLC, and DAMION BENNETT,<br>Defendants. | Civil Action No. 4:26-cv-00369-ALM |

| | |
|---|---|
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br>Plaintiffs,<br>v.<br>HARRISON GUNWORKS LLC, and TYLER HARRISON,<br>Defendants. | Civil Action No. 4:26-cv-00379-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br>Plaintiffs,<br>v.<br>STEVEN NGUYEN, d/b/a POLYMER PEW,<br>Defendant. | Civil Action No. 4:26-cv-00425-ALM |
| ABC IP, LLC, and RARE BREED TRIGGERS, INC.,<br>Plaintiffs,<br>v.<br>Z3 PRODUCTIONS LLC, d/b/a Z3PRO,<br>Defendant. | Civil Action No. 4:26-cv-00367-ALM |

[redacted]

**DECLARATION OF ERIC J. PHILLIPS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' CONSOLIDATED MOTION FOR PRELIMINARY INJUNCTION**

I, ERIC J. PHILLIPS, declare as follows:

**1. Qualifications**

1. I am President of VLF Consulting, Inc. ("VLF"), a business advisory firm. VLF assists clients with accounting, financial, economic, and marketing issues during complex commercial disputes (frequently involving intellectual property) and other valuation matters.

2. I have 25 years of experience specializing in intellectual property damages and valuation. Throughout this time, I have supervised and participated in the determination of damages across a wide range of industries. I have also provided consulting services that include the valuation of patents, trademarks, copyrights, trade secrets, and know-how in the contexts of bankruptcy proceedings, licensing negotiations/transactions, and joint ventures. Being certified in business valuation, I have also been engaged to provide business valuation services.

3. I am a Certified Valuation Analyst (CVA) and a Master Analyst in Financial Forensics (MAFF) through the National Association of Certified Valuators and Analysts (NACVA). I am also a member of the Licensing Executives Society (LES). My curriculum vitae, including a listing of my prior testimony and publications, is attached hereto as Exhibit 1.

4. VLF is being compensated for my time on this matter at my current hourly rate. VLF's compensation is not dependent on any outcomes in this litigation.

**2. Assignment**

5. VLF was retained in this matter by Emerson, Thomson & Bennett, LLC, counsel for several defendants (collectively, "Defendants"[1]) in suits brought by Rare Breed Triggers, Inc.,

[1] Specifically, the defendants in the cases: *ABC IP, LLC et al., v. 80MILLS LLC, et al.*; *ABC IP, LLC et al., v. DNT LLC et al.*; *ABC IP, LLC et al., v. Hanes Tactical, LLC et al.*; *ABC IP, LLC et al., v. Harrison Gunworks LLC et al.*; *ABC IP, LLC et al., v. Steven Thanh Nguyen*; and *ABC IP, LLC et al., v. Z3 Productions LLC*.

("Rare Breed") and ABC IP, LLC ("ABC IP"), (collectively, "Plaintiffs"). Plaintiffs allege that Defendants, through their sales of primarily "Super Safety" mechanisms, infringe a variety of Plaintiff's U.S. patents (collectively, the "patents-in-suit") and "FRT"-related trademarks. [2] Accused products sold by each defendant are summarized below:[3]

| Defendant | Asserted Patents / Trademarks | Accused Products |
|---|---|---|
| **80Mills, P. Gardner** | 5 patents | Super Safety, Super Safety kits |
| **DNT LLC, Z. Morrow** | 9 patents, FRT trademarks | Super Safety, parts, jigs, and complete kits; Super Selektor; reselling ARC-Fire and Partisan Disruptor |
| **Hanes Tactical, D. Terrell** | 6 patents | Super Safety and triggers via FaceBook |
| **Harrison Gunworks** | 9 patents, FRT trademarks | Super Safety, kits, Defender cassette-style (drop-in) FRTs, MARC selector. |
| **Steven Nguyen / Polymer Pew** | 5 patents, FRT trademarks | Super Safety, parts, kits, reselling ARC-Fire, via website & Facebook |
| **Z3 Productions** | 5 patents | Super Safety, parts, via website & Facebook |

6. In support of its request for a preliminary injunction, Plaintiffs submitted the "Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction," dated May 28, 2026. In that declaration, Eichmann's "assignment [was] to evaluate whether the alleged conduct is capable of causing immediate, ongoing, and irreparable economic

[2] Although Rare Breed asserts both patent and trademark infringement against certain defendants, I understand that its requested preliminary injunction to enjoin Defendants' sales relates to the patent infringement claims, since a preliminary injunction related to trademark claims would enjoin Defendants' possible use of the trademarks-in-suit, not necessarily Defendants' sales of the products. See, e.g., *ABC IP, LLC et al., v. DNT LLC et al.*, Sixth Amended Complaint for Patent Infringement, 5/27/26, p. 209, seeking a preliminary injunction on DNT's use of the mark "FRT" or similar.

[3] Sources: *ABC IP, LLC et al., v. 80MILLS LLC, et al.*, Fourth Amended Complaint for Patent Infringement, 5/26/26 ("80Mills Complaint"); *ABC IP, LLC et al., v. DNT LLC et al.*, Sixth Amended Complaint for Patent Infringement, 5/27/26 ("DNT Complaint"); *ABC IP, LLC et al., v. Hanes Tactical, LLC et al.*, Fourth Amended Complaint for Patent Infringement, 5/26/26 ("Hanes Complaint"); *ABC IP, LLC et al., v. Harrison Gunworks LLC et al.*, Third Amended Complaint for Patent Infringement, 5/27/26 ("Harrison Complaint"); *ABC IP, LLC et al., v. Steven Thanh Nguyen*, Second Amended Complaint for Patent Infringement, 5/27/26 ("Nguyen Complaint"); and *ABC IP, LLC et al., v. Z3 Productions LLC,* Third Amended Complaint for Patent Infringement, 5/26/26 ("Z3 Complaint").

harm, including harm arising from cumulative competitive effects associated with the presence of multiple competing sellers in the relevant market, and whether such harm would be adequately remedied through monetary damages at the conclusion of the case."[4] Eichmann's assessment pertains to Super Safety, Atrius Forced Reset Selector ("Atrius Selector"), MARC Selector, and ARC-Fire (by AS Designs) products, which Eichmann refers to as the "Accused Products."[5] VLF has been asked to review and assess the Eichmann Declaration and to provide my independent opinion as to the likely extent of irreparable harm and adequacy of monetary damages, assuming infringement of the patents-in-suit.[6]

7. In developing the opinions reflected in this report, I relied upon various filings in this case, publicly available information, applicable legal and accounting principles, and my professional experience. A listing of documents reviewed or relied upon to date in connection with this report is attached as Exhibit 2 or referenced in the text and footnotes of this report.

8. I may be asked to testify at a deposition and/or hearing regarding these and related matters between the parties.[7] In connection with any such hearing testimony, I may prepare demonstrative exhibits and identify documents and testimony in this matter that may assist with my testimony. I have not yet prepared and/or identified such exhibits.

9. For the limited purposes of this declaration, I accept as assumptions most of the characterizations put forth in the Eichmann Declaration regarding the products, companies, and market. My assumptions are not intended to reflect agreement or endorsement of those

[4] Eichmann Declaration 5/28/26, ¶3.
[5] Eichmann Declaration 5/28/26, ¶3.
[6] I do not opine on the infringement or the validity of the patents-in-suit, or their inventorship and ownership, nor am I offering any legal opinions.
[7] I may also be asked to eventually provide opinions as to damages suffered by Plaintiffs related to the alleged infringement of the patents-in-suit and trademarks-in-suit. Because discovery has not yet begun, I reserve the right to modify opinions expressed herein based upon documents, testimony, and other information identified in that process.

characterizations, and I may later rebut aspects of those assumptions if appropriate, as documents, testimony, and other information are identified in the discovery process.

### 3. Summary of Conclusions

10. The Eichmann Declaration suggests possible long-term damage to Rare Breed, such as market share and price erosion, that conflicts with Eichmann's own characterizations of the market. Eichmann also suggests vague and unsupported threats of "channel disruption," "market confusion" and "reputational harm," but the primary threat is that of lost sales in a known market. Although Eichmann does not directly assert that Rare Breed has lost sales due to Defendants,[8] such lost sales (and Rare Breed's related profits) can be easily quantified based on Eichmann's assertions. Threats of "market confusion" and "reputational harm" are contradicted by Rare Breed's own representations that the market is a "small, niche segment" where "customers actively comparison-shop before purchasing" and "routinely discuss and compare products" on forums and social media,[9] and Eichmann's acknowledgement that "pricing, availability, and brand identity are transparent"[10] to this "enthusiast customer base."[11] The remaining "threats" (e.g. market share, price erosion) would be expected to resolve in Rare Breed's favor following a ruling for Rare Breed and a subsequent permanent injunction. The effects of an injunction would not be symmetric—Defendants' market shares would drop to zero, and they would then have difficulty proving what their market shares ought to have been. Lastly, I conclude that a reasonable royalty on the accused sales would likely be within the Defendants' ability to pay.

---

[8] See, e.g., Eichmann Declaration 5/28/26, ¶11 at section "Lost Market Share and Permanent Market Displacement" – the "sale of competing products would be expected, **as a matter of economic theory**, to result in displacement of demand from Plaintiffs' products. According to the DeMonico Declaration, **Rare Breed is reported to have experienced material displacement**…" (emphasis added)

[9] Declaration of Lawrence DeMonico in Support of Plaintiffs' Motion for Preliminary Injunction, 5/28/26, ¶69 ("DeMonico Declaration").

[10] Eichmann Declaration 5/28/26, ¶9.

[11] Eichmann Declaration 5/28/26, ¶9.

## 4. Eichmann's Irreparable Harm and Adequacy of Monetary Damages Opinions

11. The Eichmann Declaration opines that "the alleged conduct can cause immediate, ongoing, and compounding economic harm" and suggests such harm may reflect "cumulative, path-dependent changes in expectations, relationships, pricing dynamics, and competitive positioning," concluding that "[t]hese economic considerations are consistent with the conclusion that monetary relief alone may be insufficient to prevent or remedy the effects of the alleged conduct during the pendency of this case."[12] In the following sections I address the support for those conclusions.

### 4.1. Economic Characteristics of the Relevant Market

12. Eichmann states that "the products at issue are durable or semi-durable consumer firearm components…associated with mechanically resetting trigger functionality"[13] for AR-pattern and related firearms (which Eichmann had previously described as "forced reset trigger ('FRT') mechanisms."[14] Eichmann characterizes this FRT market as "a differentiated niche market rather than a commodity market."[15]

13. Eichmann then states that in this market, "one product can displace another over a relatively short period of time," but then explains that, to the contrary, "early competitive displacement may persist even if the original supplier later seeks to restore its market position."[16] These are contradictory characterizations of the market – one where the market leader (such as

[12] Eichmann Declaration 5/28/26, ¶¶56, 58.
[13] Eichmann Declaration 5/28/26, ¶5.
[14] Eichmann Declaration 4/24/26, ¶5 in *ABC IP, LLC et al., v. AS Designs et al*.
[15] Eichmann Declaration 5/28/26, ¶6.
[16] Eichmann Declaration 5/28/26, ¶¶6-7. Eichmann suggests (¶8) that this persistent market share loss due to early displacement can occur "where these non-price attributes play a central role in purchasing decisions": product design, perceived reliability, brand identity, and access to distribution channels. Yet most (or all) of these attributes are unrelated to the patents-in-suit. I.e., the posited "longer-term erosion of market position" (¶8) is tied to factors mostly unrelated to the patents-in-suit.

Rare Breed[17]) can be easily displaced by a competitor over a short period of time, but then has difficulty regaining its market share after the competitor exits the market (such as due to a post-litigation injunction, as Rare Breed is seeking[18]).

4.2. Permanent Lost Sales and Market Share

14. Eichmann states that because the Accused Products are durable or semi-durable and may be "viable alternatives," sales by Defendants exhaust that demand opportunity, and so "[e]ven if [Rare Breed] later prevails in litigation, the customer may have no economic incentive to repurchase the displaced product during its useful life."[19]

15. But if in fact the "relevant demand opportunity is effectively exhausted," then there would be no further follow-on/replacement sales or opportunities lost beyond the single lost sale. As such, Plaintiff's lost sales would be relatively easy to identify and quantify.[20] Awarding plaintiffs their lost profits from lost sales is commonly done in patent infringement cases and other business disputes.[21] Such a calculation would be expected to capture this demand opportunity (i.e. the sale of the accused device), thereby making Plaintiffs whole for that permanently-lost sale.

[17] The Declaration of Lawrence DeMonico in Support of Plaintiffs' Motion for Preliminary Injunction, 5/28/26, states that "Rare Breed effectively held the entire commercially available 'forced reset' trigger market when it first launched its products." (¶75) Rare Breed's FRT-15 was brought to market "at the end of 2020" (¶10) and may have been sold up to around January 2023 when a temporary restraining order was entered. See DeMonico Declaration 5/28/26 at ¶12 and Memorandum & Order dated 9/5/23, p. 4, in *U.S. v. Rare Breed Triggers, LLC, et al.*, 23-cv-369 (NRM)(RML) (EDNY). Rare Breed recommenced FRT-15 sales subsequent to its May 2025 settlement with the DOJ (see DeMonico Declaration 5/28/26 at ¶¶14, 61).

[18] Rare Breed seeks a permanent injunction after a finding of infringement of the patents-in-suit. See 80Mills Complaint, p. 62; DNT Complaint, p. 209; Hanes Complaint, p. 67; Harrison Complaint, p. 146; Nguyen Complaint, p. 114; Z3 Complaint, p. 63.

[19] Eichmann Declaration 5/28/26, ¶10.

[20] Again, Eichmann does not directly assert that Rare Breed is losing sales to Defendants, only that "[i]n this [durable goods] context, the introduction and sale of competing products would be expected, **as a matter of economic theory**, to result in displacement of demand from Plaintiffs' products." Eichmann Declaration 5/28/26, ¶11.

[21] See, e.g., *The Comprehensive Guide to Lost Profits Damages for Experts and Attorneys*, Nancy J. Fannon, 2011 ed; *Recovery of Damages For Lost Profits*, Robert L. Dunn, 6th Ed. Vol. 1, Vol. 2, 2022 Supplement.

16. I understand that when a patent is found infringed, the patentee is entitled under 35 U.S.C §284 to "damages adequate to compensate for infringement…" In assessing lost profits, damages experts reconstruct the market to show, hypothetically, likely outcomes with infringement factored out of the economic picture;[22] this is referred to as a "market reconstruction."[23] The Federal Circuit has affirmed lost profit awards based on a wide variety of reconstruction theories where the patentee has presented reliable economic evidence of "but for" causation.[24]

17. In patent cases, this market reconstruction is typically performed in the context of the 4-factor *Panduit* analysis, whereby lost profits can be awarded upon a showing of:[25]

- Demand for the patented product;
- Absence of acceptable non-infringing substitutes;
- Manufacturing and marketing capabilities to exploit the demand; and
- The amount of profit that the patent holder would have earned.

18. Eichmann suggests lost sales by Rare Breed due to Defendants,[26] and does not opine that any of these factors cannot be met.

19. <u>Demand</u>. The "demand" factor is typically met by a showing of actual sales by the patentee of its patented product.[27] Again, Eichmann does not suggest this factor might not be met, but instead notes that Rare Breed has had and continues to have a strong market presence, stating

[22] *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1355 (Fed. Cir. 2001).
[23] *Grain Processing Corp. v. American Maize-Products*, 185 F. 3d 1341, 1350, 1351 (Fed. Cir. 1999).
[24] *Crystal Semiconductor*, 246 F.3d at 1355.
[25] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978)
[26] Eichmann Declaration 5/28/26, ¶¶10-11 and footnote 11, that the overlap in core functionality and lack of non-infringing alternatives "would be expected…to result in displacement of demand from Plaintiffs' products."
[27] *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F. 3d 1314, 1330 (Fed. Cir. 2009).

it "held effectively the entire resetting trigger product category in the market upon launch and estimating now to hold [redacted][28]

20. Absence of acceptable non-infringing substitutes. Eichmann states that the accused infringement "relates to the core functionality of the products, and that the same functionality is not available in non-infringing alternative products.[29] Such a market as characterized by Eichmann is known as a two-supplier market, where "one may infer that the patentee would have made the infringer's sales or charged higher prices but for the infringing competition."[30]

21. Manufacturing and marketing capabilities. Eichmann did not opine that Plaintiffs lack manufacturing or marketing capability. Eichmann does cite to the DeMonico Declaration's statements that Rare Breed had increased its manufacturing capacity, and had excess capacity and inventory around the time accused infringing products entered the market.[31]

22. The amount of profit. Again, Eichmann does not opine that Plaintiffs cannot calculate the amount of profits associated with a lost sale. Eichmann identifies pre-infringement pricing of Rare Breed's FRT-15L3 product ($499) that can presumably be used for such a calculation,[32] and Rare Breed has provided a calculation of its manufacturing costs and "combined lost profit" per unit.[33]

23. I conclude that, to the extent the Panduit factors are met, Plaintiffs can be made whole by an award of lost profits related to any such exhausted/permanent lost sale opportunity.

[28] Eichmann Declaration 5/28/26, ¶11, citing DeMonico Declaration 5/28/26, ¶75.

[29] Eichmann Declaration 5/28/26, ¶10 and footnote 11, citing Luettke Declaration 5/28/26, §§IV, V (functional overlap), §VI (lack of non-infringing alternatives in the FRT category). Luettke's opinions are based on comparing the Accused Products and Rare Breed's FRT triggers.

[30] *Amstar Corp. v. Envirotech Corp.,* 823 F. 2d 1538, 1543 (Fed. Cir. 1987). See also *State Industries, Inc. v. Mor-Flo Industries, Inc*., 883 F. 2d 1573, 1578 (Fed. Cir. 1989), ruling that in a two-supplier market, "the Panduit test is usually straightforward and dispositive."

[31] Eichmann Declaration 5/28/26, ¶24 at footnote 32, citing DeMonico Declaration 5/28/26, ¶71.

[32] Eichmann Declaration 5/28/26, ¶25.

[33] DeMonico Declaration 5/28/26, ¶59.

Such sales by Defendant are not irreparable, but are instead compensable through such a calculation.

24. Customer stickiness. Eichmann next asserts that sales by Defendants "effectively removes that customer from the addressable market for the incumbent for the duration of the product's useful life."[34] In other words, Defendants' customers may never purchase additional FRTs from Plaintiffs because of their "familiarity, switching costs, and platform-specific preferences."[35] This assertion has multiple flaws. First, any additional Accused Product sales by Defendants to a particular customer due to such stickiness would be included in its sales data and thereby included in a damages calculation, making such harm compensable. Second, no evidence is presented to support this supposed stickiness or presumption that, looking into the future, Defendants' customers will refuse other FRT makers (due to familiarity, switching costs, and platform-specific preferences), despite several reasons a customer of Defendants might switch suppliers. Defendant declarations indicate that in fact customers commonly switch trigger products for a variety of reasons.[36] Third, plaintiffs are seeking an injunction at the end of the litigation. Assuming *arguendo* that Defendants' customers had removed themselves from Plaintiffs' addressable market, an injunction would return them to the addressable market. In the two-supplier market identified by Eichmann, Plaintiffs would then remain the sole FRT option, with no non-infringing substitutes available. Fourth, the assertion is inconsistent with Eichmann's

[34] Eichmann Declaration 5/28/26, ¶13.

[35] Eichmann Declaration 5/28/26, ¶14.

[36] Gardner Declaration (80Mills), 8/12/26, ¶¶6-7; Morrow Declaration (DNT), 8/11/26, ¶¶5-6; Bennett Declaration (Hanes Tactical), 8/11/26, ¶¶6-7; Harrison Declaration (Harrison Gunworks), 8/12/26, ¶¶6-7; Nguyen Declaration (Polymer Pew), 8/10/26, ¶¶6-7; Bytyqi Declaration (Z3Pro), 8/12/26, ¶¶6-7 (stating that customers commonly switch products for such reasons as: failures; preference in trigger feel, shape, and look; functionality differences; and spur-of-the-moment purchasing. Additionally, the firearms market has a plethora of customers with random preferences, wants, and needs in the products they buy and sometimes change out a product merely due to curiosity. Further, switching costs to users are insignificant, since they are not wedded to a particular FRT platform/style after installing one.)

market characterization, (¶6) "where one product can displace another over a relatively short period of time." If Defendants were removed from the market through an end-of-litigation injunction, Rare Breed would more likely, under his characterization, be expected to gain share "over a relatively short period of time."

4.3. Lost Lead Time and Market Exclusivity

25. Eichmann opines that the period following Rare Breed's May 2025 DOJ settlement was a "non-recurring opportunity for the patentee to establish its market position," and that monetary damages "cannot recreate the lost period of exclusivity or the associated opportunity to establish first-mover advantages and market structure."[37] Yet any "first-mover advantages and market structure" presumably lost by Rare Breed are not identified.[38] Ultimately, any such first-mover advantages come down to one amount—Rare Breed's profits on its sales in a known market. As explained above, the calculation of lost profits from lost sales in patent cases involves a "market reconstruction" – recreating the market but for infringement. Hence, monetary damages does in fact "recreate the lost period of exclusivity."

4.4. Distribution and Channel Disruption / Dealer Stickiness

26. Turning next to dealers, Eichmann asserts that sales by Defendants during the pendency of litigation lead to dealer attention, greater visibility, and channel support, leading to further adoption after the litigation.[39] Eichmann opines that such dealer investments in "training, compliance processes, and inventory" create de facto lock-in, creating ongoing harm after

[37] Eichmann Declaration 5/28/26, ¶19.

[38] It should be noted that Defendants, of course, did not obtain a "first mover advantage" at Rare Breed's expense, since Rare Breed presumably had obtained and realized any such "first mover advantage" when it sold $39 million in FRTs over the two years starting late 2020. See Memorandum & Order dated 9/5/23, p. 1, in *U.S. v. Rare Breed Triggers, LLC, et al.*, 23-cv-369 (NRM)(RML) (EDNY).

[39] Eichmann Declaration 5/28/26, ¶15.

litigation.[40] Eichmann claims that once dealers begin selling a competing product, they "may not revert to the original supplier" due to their investments in inventory, training, etc., "even if [the] competing product is no longer available."[41]

27. First, these assertions do not appear relevant to this litigation, since Eichmann acknowledges Rare Breed has no dealer network.[42] Second, Eichmann makes no attempt to identify any efforts or quantify any amounts that dealers actually (or plan to) "invest[ed] in training, compliance processes, and inventory" for either Accused Products or Rare Breed products. Third, this assertion, too, neglects that an injunction at the end of litigation would end any dealer lock-in that may have occurred, as Accused Products would no longer be available to them. Fourth, the assertion is inconsistent with Eichmann's market characterization, (¶6) "where one product can displace another over a relatively short period of time." If Defendants were removed from the market through an end-of-litigation injunction, Rare Breed would more likely, under his characterization, be expected to gain share "over a relatively short period of time."

28. Eichmann adds that "even if a competing product is later removed from the market, intermediaries may not revert to the original supplier because doing so would require reinvestment, operational disruption, and renewed uncertainty regarding product continuity."[43] But in the two-supplier market suggested by the Eichmann Declaration where no non-infringing alternatives exist, it seems unlikely that, after an end-of-litigation injunction against Defendants, these hypothetical dealers would not revert to sole supplier Rare Breed, choosing instead to forego any and all FRT sales. Further, these three suggested sources of dealer lock-in are unsupported. Dealers' "operational disruption" and the need for dealer "reinvestment" seem to presume that Defendants

[40] Eichmann Declaration 5/28/26, ¶16.
[41] Eichmann Declaration 5/28/26, ¶¶20-24 at 21.
[42] Eichmann Declaration 5/28/26, ¶20 at footnote 27.
[43] Eichmann Declaration 5/28/26, ¶21.

establish dealer arrangements and somehow deny Rare Breed the opportunity to sell through those dealers, an unsupported hypothetical. Dealer stubbornness caused by "renewed uncertainty regarding product continuity" also does not fit – assuming *arguendo* that such uncertainty creates economic damage in channels, this seems more an argument *against* a preliminary injunction, as Defendants are the ones faced with a product discontinuity, not Rare Breed.

29. Here, Eichmann notes that Rare Breed [redacted]"[44] Even by Eichmann's telling, Rare Breed's lack of a [redacted] appears to be its own decision. Nor is any concrete damage to Rare Breed identified here, apart from simply the availability of infringing product such as Defendants', which is compensable through an award of damages.[45] Eichmann further notes that Rare Breed [redacted]"[46] Yet [redacted] does not, however, indicate damages. The fundamental calculus of using a dealer network is that the manufacturer accepts a lower selling price (and hence lower gross margin) in exchange for (1) broader market reach and faster scaling (greater sales), and (2) reduced costs by not having to deal with orders, fulfillment, returns, and warehousing/inventory levels.[47] A rational company would thus add a dealer network only if the

[44] Eichmann Declaration 5/28/26, ¶24, citing DeMonico Declaration 5/28/26, ¶72.

[45] I understand, however, that none of Defendants [redacted]. See Gardner Declaration (80Mills), 8/12/26, ¶14; Morrow Declaration (DNT), 8/11/26, ¶13; Bennett Declaration (Hanes Tactical), 8/11/26, ¶14; Harrison Declaration (Harrison Gunworks), 8/12/26, ¶14; Nguyen Declaration (Polymer Pew), 8/10/26, ¶14; Bytyqi Declaration (Z3Pro), 8/12/26, ¶14.

[46] Eichmann Declaration 5/28/26, ¶24, citing DeMonico Declaration 5/28/26, ¶¶71, 77. DeMonico ¶77 states: [redacted]

[47] See, e.g., "Understanding Distribution Channels in Business: How They Function," at https://www.investopedia.com/terms/d/distribution-channel.asp; "The Pros and Cons of Direct and Indirect Product Distribution," Business Development Bank of Canada, at https://www.bdc.ca/en/articles-tools/marketing-sales-export/marketing/how-bring-new-product-market; Andjelkovic, A. and Marija Radosavljevic, "The Length of the Distribution Channel as a Factor of its Efficiency," *Strategic Management*, Vol. 25 (2020), No. 2, pp. 9-17.

net of its added sales and lower costs offset the gross margin reduction that normally comes from selling to dealers.

4.5. Price Erosion

30. Having noted that "Defendants offer the Accused Products at substantially lower price points, generally between approximately $80 and $269" as compared to Rare Breed's products,[48] Eichmann asserts that such lower prices "can anchor expectations among both dealers and end customers," possibly leading to price erosion.[49] Eichmann states that "Rare Breed reduced the retail price of the FRT-15L3 from $499 to $450 in response to the influx of competing infringing FRT products."[50]

31. Should this litigation continue to trial and be resolved in the Plaintiffs' favor, any economic harm resulting from price erosion can be awarded as monetary damages. As the Federal Circuit observed in *Crystal*, "The Supreme Court opened the door for price erosion damages in 1886: 'Reduction of prices, and consequent loss of profits, enforced by infringing competition, is a proper ground for awarding of damages. The only question is as to the character and sufficiency of the evidence in the particular case.' "[51] Assuming that Accused Product sales has led to "displacement of demand from Plaintiffs' products"[52] (i.e. lost sales) in this two-supplier market with no available non-infringing alternatives as posited by Eichmann, then lost profits could be calculated using the greater pre-infringement pricing identified by Eichmann and Rare Breed. Further, if it is shown that Plaintiffs lowered prices on its actual sales due to Defendants, then that

[48] Eichmann Declaration 5/28/26, ¶5.
[49] Eichmann Declaration 5/28/26, ¶¶25, 26.
[50] Eichmann Declaration 5/28/26, ¶25, citing DeMonico Declaration 5/28/26, ¶61.
[51] *Crystal Semiconductor*, 246 F.3d at 1357, citing *Yale Lock Mfg. Co. v. Sargent*, 117 U.S. 536, 551, 6 S.Ct. 934, 29 L.Ed. 954 (1886).
[52] Eichmann Declaration 5/28/26, ¶11.

price differential can also be calculated (again based on pricing already identified by Eichmann and Rare Breed), thus making Plaintiffs whole.

32. Role of Product Differences. Eichmann, however, does not address the significant differences between the Accused Products and those offered by Rare Breed. The four Accused Products differ from Rare Breed's FRT products in significant ways. This raises substantive questions as to the extent to which Accused Products might affect the FRT-15L3 price as asserted.[53]

33. The Accused Products fall into two categories: (1) Super Safety, which replaces the rifle's selector with a push-button cam; and (2) ARC-Fire / MARC Selector / Atrius Selector,

[53] Eichmann suggests price erosion on only one of Rare Breed's several products, the FRT-15L3. See Eichmann Declaration 5/28/26, ¶25, citing DeMonico Declaration 5/28/26, ¶61.

which use a standard-type selector switch (usually ambidextrous, or "ambi") along with a replacement cam / lever.

34. Examples of Super Safety Accused Products are below:



**Figure 1. Super Safety, flat trigger (DNT).** [54]



**Figure 2. Super Safety complete kit (DNT).** [55]



**Figure 3. Super Safety (Harrison).** [56]



**Figure 4. Super Safety with trigger-cutting jig (Z3 Pro).** [57]

[54] https://deeznutztactical.com/product/flat-4140-ss-set/
[55] https://deeznutztactical.com/product/d2-complete-fcg-flat-super-safety-kit/
[56] https://harrisongunworks.com/product/ar-super-safety-d2-curved-kit/
[57] https://www.z3pro.com/product-page/copy-of-batch-7-cpm-10v-a2-ar-super-safety-kit

35. The ARC-Fire and MARC Selector products are pictured below:[58]



**Figure 5. ARC-Fire V2 Ambi Kit (made by AS Designs).**[59]



**Figure 6. MARC Selector (Harrison).**[60]

36. Super Safety kits typically include a pre-cut mil-spec trigger,[61] as do ARC-Fire kits, but do not include the remaining springs, hammer, disconnector, and pins needed to install, since customers typically have those parts already and would reuse them when installing the Accused Products. MARC Selectors do not include the trigger or other related components.[62] The Super Safety is sometimes offered in complete kits (as shown above) that include the entire fire control group ("FCG").

[58] I do not specifically address the Atrius Selector because I understand that none of Defendants sell or have sold Atrius Selectors, although DNT LLC previously sold some similar products, which it discontinued. DNT now resells the ARC-Fire, a similar product. See Morrow Declaration (DNT), 8/11/26 at ¶4.
[59] https://deeznutztactical.com/product/v2-arc-fire-ambi-0-90-180-kit-2/. See also ARC-Fire kit per https://activesafetydesigns.com/ar15/arc-fire-trigger-v2-ambi-kit-0-45-180/ (as of 5/22/26)
[60] https://harrisongunworks.com/product/marc-ambi-ar15-forced-reset-trigger/
[61] "Mil-spec trigger" refers to the standard, or "military specification," trigger commonly used in AR-pattern rifles. "Pre-cut" refers to the machining modification that must be performed in order for a standard trigger to work with the ARC-Fire or Super Safety, consisting of cutting off a particular portion of the back corner.
[62] https://harrisongunworks.com/product/marc-ambi-ar15-forced-reset-trigger/

37. By contrast, below are Rare Breed's current offerings:[63]




**Figure 7. Rare Breed triggers, as shown on its website.**

38. Accused Products and Plaintiff's FRT-15L3 differ significantly, described as follows.

[63] https://rarebreedtriggers.com/product-category/triggers/. Shown are the 8 variants of its 5 primary products: (1) FRT-15L3 (3-position-safety and single-stage trigger); (2) FRT-15C3 (3-position-safety and two-stage trigger); (3) FRT-MR3 (3-position-safety and single-stage trigger for HK MR223 and HK MR556 platforms); (4) FRT-SG3 (3-position-safety and two-stage trigger for B&T platforms); and (5) FRT-RD3 (3-position-safety and two-stage trigger for HK MP5/SP5 platform).

39. Installation. Rare Breed's FRT-15L3 is a drop-in assembly (also called a cassette), unlike the Accused Products that typically include only the cam, reset lever, trigger, and (for the ARC-Fire and MARC) safety selector switch(es), but do not include the springs, hammer, disconnector, and pins needed.[64] The Accused Products thereby require additional installation steps (and those parts) and competency to complete the work.

40. Triggers. The FRT-15L3 is a single-stage 3-position-safety trigger,[65] whereas Accused Products are compatible with, and sometimes sold with, two-stage triggers. Defendant declarations state that they have seen a growing number of customers who want two-stage triggers or at least the option to install one.[66] The modular nature of the Accused Products also allows users to later switch / upgrade trigger assemblies (such as to a higher-end Geissele, or simply to a different style of trigger) without needing to replace the entire assembly as required of Rare Breed's drop-in products; Defendants have considered this a strong selling point and advantage over Rare Breed's products.[67]

41. Selectors. The Super Safety replaces the AR-15 standard safety lever with a push-button cam, a significant difference in the user interface.[68] I understand that this distinction would be understood by Accused Products customers when making their purchasing decision, and would

[64] As noted above, Super Safety is sometimes ordered along with other FCG components (hammer, springs, etc.) but those instances still require the same parts, know-how, and customer competency to install the parts.

[65] "Single stage" trigger refers to a trigger with one continuous stage of resistance when pulled. A "two-stage" trigger has two distinct phases—an initial take-up followed by a second stage with greater resistance. "3-position" refers to the safety selector having 3 possible positions – Safe, Semi-automatic, and FRT. See, e.g., https://rarebreedtriggers.com/product/frt-15c3/. See also DeMonico Declaration 5/58/26, ¶¶21, 26, describing some of these product differences and features.

[66] Gardner Declaration (80Mills), 8/12/26, ¶12; Morrow Declaration (DNT), 8/11/26, ¶11; Bennett Declaration (Hanes Tactical), 8/11/26, ¶12; Harrison Declaration (Harrison Gunworks), 8/12/26, ¶12; Nguyen Declaration (Polymer Pew), 8/10/26, ¶12; Bytyqi Declaration (Z3Pro), 8/12/26, ¶12.

[67] Gardner Declaration (80Mills), 8/12/26, ¶10; Morrow Declaration (DNT), 8/11/26, ¶9; Bennett Declaration (Hanes Tactical), 8/11/26, ¶10; Harrison Declaration (Harrison Gunworks), 8/12/26, ¶10; Nguyen Declaration (Polymer Pew), 8/10/26, ¶10; Bytyqi Declaration (Z3Pro), 8/12/26, ¶10.

[68] Gardner Declaration (80Mills), 8/12/26, ¶13; Morrow Declaration (DNT), 8/11/26, ¶12; Bennett Declaration (Hanes Tactical), 8/11/26, ¶13; Harrison Declaration (Harrison Gunworks), 8/12/26, ¶13; Nguyen Declaration (Polymer Pew), 8/10/26, ¶13; Bytyqi Declaration (Z3Pro), 8/12/26, ¶13.

also clearly indicate, once installed, that the product is a Super Safety-type mechanism and not a Rare Breed product.[69]

42. Eichmann suggests a substantial role of features and preferences when characterizing the market as a "differentiated niche market rather than a commodity market."[70] Such differentiated niche markets involve "discrete choices among alternatives that are not perfectly substitutable," unlike commodity markets where "competition occurs primarily along price dimensions."[71] "In such markets, competitive position is shaped not only by price, but also by non-price factors" including product design.[72] Since these differences between Plaintiffs' and Defendants' products play a significant role in the purchasing decision, pricing changes by Plaintiff should be significantly influenced by those "non-price-factors" and user preferences.

43. Persistent price erosion. Finally, Eichmann opines that lower pricing due to competing products can "become embedded as reference points." "Although monetary relief may estimate lost profits based on observed pricing, it does not restore the pricing expectations," and this "different pricing equilibrium…cannot be recreated through retrospective compensation."[73] First, assuming this case is resolved in Plaintiffs' favor and a post-trial injunction is granted, the suggested two-supplier market would revert to a one-supplier market. Plaintiffs would then be reasonably expected to set prices to its profit-maximizing level, typical pricing behavior in monopoly markets where consumers lack substitutes. Second, Eichmann and Plaintiffs have identified pre-infringement pricing of Rare Breed's patented FRT-15L3 ($499), so Plaintiffs have apparently resolved any uncertainty as to its but-for pricing. Third, this assertion of persistent

[69] *Ibid*.
[70] Eichmann Declaration 5/28/26, ¶6.
[71] Eichmann Declaration 5/28/26, ¶6.
[72] Eichmann Declaration 5/28/26, ¶8.
[73] Eichmann Declaration 5/28/26, ¶29.

pricing harm directly conflicts with Eichmann's characterization of this durable-goods market. Eichmann explained that "the purchase of a competing product effectively removes that customer from the addressable market for the incumbent for the duration of the product's useful life." [74] Accordingly, if the litigation is resolved in Plaintiff's favor, post-litigation customers would be expected to be first-time buyers with little to no knowledge of prior price reference points. Such customers would be reasonably expected to have little resistance or knowledge of plaintiff's return to pre-litigation pricing.

4.6. Uncertainty and Market Confusion

44. Eichmann suggests possible "ongoing market confusion and erosion of product differentiation" [75] due to the products having "overlapping functionality and similar outward characteristics."[76] Yet as explained (and pictured) above, the Accused Products have substantial visual differences from Rare Breed's products, and I understand that the differences in the products themselves, installation and ancillary parts requirements, and how they operate is generally understood by the enthusiast customers of Accused Products.[77]

45. The assertion may also be misplaced with respect to defendants 80Mills, Hanes, and Z3 Pro, where Rare Breed's claims only pertain to patent infringement, unlike Plaintiff's claims against DNT, Harrison, and Nguyen where trademark infringement claims are being asserted.[78]

[74] Eichmann Declaration 5/28/26, ¶13.
[75] Eichmann Declaration 5/28/26, ¶32.
[76] Eichmann Declaration 5/28/26, ¶30.
[77] Gardner Declaration (80Mills), 8/12/26, ¶13; Morrow Declaration (DNT), 8/11/26, ¶12; Bennett Declaration (Hanes Tactical), 8/11/26, ¶13; Harrison Declaration (Harrison Gunworks), 8/12/26, ¶13; Nguyen Declaration (Polymer Pew), 8/10/26, ¶13; Bytyqi Declaration (Z3Pro), 8/12/26, ¶13.
[78] Eichmann does not indicate whether the alleged confusion is due to the use of FRT trademarks or the extent to which an injunction against using the FRT trademarks could sufficiently address such confusion.

46. These alleged uncertainties conflict with Eichmann's own characterization of the market as one where "product design, perceived reliability, brand identity, and access to distribution channels… play a central role in purchasing decisions…"[79] Given that product design and brand identity play a central role in purchasing decisions, consumers would not have uncertainty regarding product source and legitimacy as he asserts,[80] nor would such uncertainty appear substantial enough to support a conclusion that "monetary damages may not fully capture the effects of ongoing market confusion and erosion of product differentiation during the pendency of the case."[81]

47. The asserted uncertainties and confusion in the market also conflict with Eichmann's characterization of the market as "highly visible" and "serving an enthusiast customer base" in channels where product attributes such as "brand identity are transparent and readily compared."[82] This characterization is consistent with the DeMonico Declaration, which states that "customers actively comparison-shop before purchasing"[83] and that "customers routinely discuss and compare products in Facebook groups, firearm forums like AR15.com, YouTube review channels, and social media."[84]

48. The only supporting evidence offered for alleged confusion in the market is the statement that "I further understand that publicly available commentary and market discussions have, at times, attributed innovations associated with Plaintiffs' products to competing products or questioned whether Plaintiffs' newer products were derived from competing designs."[85] But

[79] Eichmann Declaration 5/28/26, ¶8.
[80] Eichmann Declaration 5/28/26, ¶30.
[81] Eichmann Declaration 5/28/26, ¶32.
[82] Eichmann Declaration 5/28/26, ¶9.
[83] DeMonico Declaration 5/28/26, ¶¶65, 69.
[84] DeMonico Declaration 5/28/26, ¶69.
[85] Eichmann Declaration 5/28/26, ¶31, citing "DeMonico Declaration, ¶¶44-45, 68, and Exhibit U."

Eichmann's sourcing of this understanding includes no actual evidence of confusion, apart from the conclusory assertion by DeMonico:

a. DeMonico Declaration, ¶¶44-45, which consists of DeMonico's description of the "steady stream of public hostility" Rare Breed received on Facebook in response to its litigation conduct.

b. Exhibit U, consisting of 48 pages of Facebook comments representing the "public hostility" described in DeMonico Declaration, ¶¶44-45.

c. DeMonico Declaration, ¶68, in which DeMonico states a belief that infringing products "create public confusion about who actually invented this technology and undermine Rare Breed's reputation as the original innovator…"

49. Elsewhere in the DeMonico Declaration, one Facebook post is identified where a commenter asks whether Rare Breed's FRT-15C3 is "based on the super safety."[86] Eichmann's entire conclusion that "monetary damages may not fully capture the effects of ongoing market confusion" thereby rests only on DeMonico's assertion of public confusion and possibly one question posted on Facebook (although Eichmann does not cite to it). This paucity of evidence notwithstanding, such confusion is contradicted by Eichmann's and DeMonico's characterization of customers as "enthusiasts" in a "highly visible" market where they "actively comparison shop" and "routinely discuss and compare products."

50. Even accepting possible "customer and dealer" uncertainties, and that such uncertainties influence "willingness to pay and future purchasing behavior," any such confusion would likely be resolved if this litigation proceeds to trial and results in a favorable outcome to Rare Breed. At that time, any dealers and consumers who have delayed their purchases of FRT triggers would be expected to make their purchase from plaintiff (with no non-infringing

[86] DeMonico Declaration 5/28/26, ¶66, citing to Exhibit W (Facebook comment/question).

alternatives available), and any past lost profits from sales lost by Plaintiffs to Defendants could be awarded to Plaintiffs, making Plaintiffs whole.

4.7. Cascading Competitive Entry

51. Eichmann opines that continuing sales by a litigation defendant signals to other possible infringers that the "cost of participation is limited or delayed, thereby increasing the likelihood of additional entry."[87] As a result, "[l]ost sales and competitive effects are no longer attributable to a single source, but instead become dispersed across multiple firms, products, and distribution channels," which "creates a multi-firm attribution problem."[88]

52. But a prospective market entrant's conclusion that the "cost of participation is limited or delayed" would seem unlikely given Rare Breed's numerous patent infringement lawsuits to date, and given that these lawsuits would likely be known to such an entrant. Further, Eichmann identifies no examples of additional market entrants due to Defendants, or specific damages being done to plaintiffs, and instead focuses on hypothetical additional market entrants.

53. Eichmann further provides little basis to conclude that either form of damages – lost sales or "competitive effects" – are not compensable. As to lost sales (and associated lost market share), a patentee in such circumstances would be expected to presume a two-supplier market (i.e. Rare Breed and Defendants) and calculate lost profits based on all sales by Defendants, thereby fully compensating the patentee. As to "competitive effects," Eichmann apparently refers to price erosion as was asserted elsewhere. Yet Eichmann provides no basis to conclude that the existence of other non-party infringers creates an unsolvable "multi-firm attribution problem" for determining price erosion damages. Rare Breed would likely argue that *In re Mahurkar* applies,

[87] Eichmann Declaration 5/28/26, ¶33.
[88] Eichmann Declaration 5/28/26, ¶36.

where Judge Easterbrook (district court) expressly addressed multi-infringer price erosion and held that each infringer is liable for the *entire* price-erosion harm caused by all infringing competition, but only in proportion to the units *it* sold.[89]

4.8. <u>Reputational Harm</u>

54. Eichmann asserts that customers in this market will consider the products' "uncertainty or adverse signals regarding reliability or legitimacy, [and] those effects may extend beyond the individual product to the supplier's broader product line or brand," which "can reduce demand not only for the product at issue, but also for related offerings."[90] Such reputational harm can impact dealers' and customers' "expectations regarding quality, reliability, and risk," and those expectations "may not be fully restored even if the underlying source of uncertainty is later resolved."[91]

55. There are several flaws with these assertions. First, this non-specific discussion identifies no evidence of actual reputational harm suffered by Rare Breed, and does not even conclude that Rare Breed has suffered such harm. No examples or explanation is provided as to how Rare Breed's "legitimacy" could be somehow called into question by Defendants' continued sales. The only explanation for possible harm to Rare Breed's perceived quality and reliability is a chain of hypotheticals: "For example, reduced perceived differentiation **may** contribute to price erosion, while [said price erosion] **may** in turn signal reduced product quality or value."[92] (emphasis added)

[89] *In re Mahurkar Patent Litig.*, 831 F. Supp. 1354 (N.D. Ill. 1993) (Easterbrook, J., sitting by designation), *aff'd*, 71 F.3d 1573 (Fed. Cir. 1995). Here, the district court calculated lost profits with two components: (1) diverted sales and (2) price suppression/erosion on the sales Quinton/Mahurkar actually made. It then allocated defendant Impra's share of the total. The Federal Circuit affirmed that the district court "did not abuse its discretion in awarding damages for lost profits, based on lost sales and price erosion, or in its calculation of damages."
[90] Eichmann Declaration 5/28/26, ¶38.
[91] Eichmann Declaration 5/28/26, ¶39.
[92] Eichmann Declaration 5/28/26, ¶42.

56. Further, that this unspecified uncertainty might "extend beyond the individual product to the supplier's broader product line or brand" has limited, if any, relevance here, given that Eichmann explains[93] there is no "broader product line" since Plaintiff sells only the FRT triggers and related parts.

57. The Eichmann Declaration focuses on two potential sources of reputational harm for which some form of supporting evidence was offered, asserting that "Rare Breed may be experiencing [changes in demand and competitive positioning], including the influence of lower priced alternatives on perceived value and questions regarding innovator status."[94] Both of these possible mechanisms of harm lack support:

a. Harm to Rare Breed's "perceived value." The suggestion that Defendants' lower prices harm Rare Breed's perceived value is contradicted by Eichmann's own characterization of this "enthusiast customer base"[95] and this market where "product design, perceived reliability, brand identity…play a central role in purchasing decisions"[96] and the DeMonico Declaration's statements that "customers actively comparison-shop before purchasing."[97] As explained above (Section 4.5), Defendants' products differ substantially from Rare Breed's drop-in triggers with respect to parts included, installation, and method of operation. Defendant declarations state that the DIY enthusiast customers generally understand these distinctions and that the lower pricing is tied to those differences.[98] Based on the above, it appears unlikely that Defendants' lower pricing harms Rare Breed's "perceived value."

---

[93] Eichmann Declaration 5/28/26, ¶52 ("Plaintiffs' business is highly concentrated in FRT products and related components, and that substantially all of Rare Breed's revenue is derived from those products."), citing DeMonico Declaration 5/28/26, ¶24 ("All of Rare Breed's revenue comes from its FRT products and related FRT parts. Rare Breed does not sell any other firearms, firearm components, or accessories.").
[94] Eichmann Declaration 5/28/26, ¶43.
[95] Eichmann Declaration 5/28/26, ¶¶9, 31.
[96] Eichmann Declaration 5/28/26, ¶8.
[97] DeMonico Declaration 5/28/26, ¶¶65, 69.
[98] Gardner Declaration (80Mills), 8/12/26, ¶¶9, 13; Morrow Declaration (DNT), 8/11/26, ¶¶8, 12; Bennett Declaration (Hanes Tactical), 8/11/26, ¶¶9, 13; Harrison Declaration (Harrison Gunworks), 8/12/26, ¶¶9, 13; Nguyen Declaration (Polymer Pew), 8/10/26, ¶¶9, 13; Bytyqi Declaration (Z3Pro), 8/12/26, ¶¶9, 13.

b. Questions regarding innovator status. As explained above (Section 4.6), Rare Breed's assertions that the public may be questioning its innovator status appear to be based on one question posted to Facebook. But any such widespread confusion is contradicted by Eichmann's and DeMonico's characterization of customers as "enthusiasts" in a "highly visible" market where they "actively comparison shop" and "routinely discuss and compare products."

58. Finally, Eichmann neglects the reputational harm that could occur to due to a product's court-ordered removal from the market. Again, the suggested harms suggested by Eichmann – dealer and customer perceptions "regarding quality, reliability, and risk" – appear more relevant to Defendants (accused of infringement and facing an injunction) than Plaintiffs.

4.9. Asymmetric Economic Impact of an Injunction

59. Eichmann asserts that "continued sales allow for ongoing erosion in market share, pricing, and customer relationships…[that] become increasingly difficult to reverse." This has an "asymmetric" impact because Rare Breed is a "non-diversified firm." An injunction to Defendants, by contrast, merely limits specific products, and Defendants' lost sales "can be mitigated or redirected."[99]

60. Based upon declarations filed by Defendants, I understand that Defendants are, like Rare Breed, "non-diversified firm[s]" and that the corporate focus of each defendant is providing Accused Products and related or similar firearm mechanisms.[100] As such, Defendants indicate that

[99] Eichmann Declaration 5/28/26, ¶46.

[100] Gardner Declaration (80Mills), 8/12/26, ¶18; Morrow Declaration (DNT), 8/11/26, ¶17; Bennett Declaration (Hanes Tactical), 8/11/26, ¶18; Harrison Declaration (Harrison Gunworks), 8/12/26, ¶18; Nguyen Declaration (Polymer Pew), 8/10/26, ¶18; Bytyqi Declaration (Z3Pro), 8/12/26, ¶18.

an injunction will threaten their company's existence due to the extent of accused sales in their operations.[101]

61. Eichmann also attempts to distinguish Rare Breed from Defendants, stating "I understand that Plaintiffs incurred substantial research and development and regulatory-related expenditures in connection with the development and commercialization of their FRT products, and that these expenditures are largely sunk."[102] However, I understand based upon declarations filed by Defendants that they too have typically invested substantial amounts into development and commercialization of the Accused Products, and that these investments are largely sunk.[103]

62. Further, this partial economic harm-balancing test entirely neglects the opposing equivalent economic harm to defendants, to whom an injunction would be expected to result in similar "erosion in market share, pricing, and customer relationships" that would be "difficult to reverse," especially as a non-diversified firm.

### 4.10. Adequacy of Monetary Damages and Ability to Pay

63. I conclude that any economic harm that Plaintiffs may suffer as a result of Defendants' infringement of the patents-in-suit is measurable, and an award of monetary damages at the conclusion of this litigation can adequately compensate Plaintiffs for that harm. As explained in my analysis above, this conclusion is supported by Eichmann's characterizations of the relevant market, including: (a) the relevant products are durable or semi-durable consumer

[101] Gardner Declaration (80Mills), 8/12/26, ¶21; Morrow Declaration (DNT), 8/11/26, ¶20; Bennett Declaration (Hanes Tactical), 8/11/26, ¶21; Harrison Declaration (Harrison Gunworks), 8/12/26, ¶21; Nguyen Declaration (Polymer Pew), 8/10/26, ¶21; Bytyqi Declaration (Z3Pro), 8/12/26, ¶21.

[102] Eichmann Declaration 5/28/26, ¶44.

[103] Gardner Declaration (80Mills), 8/12/26, ¶¶17, 19; Morrow Declaration (DNT), 8/11/26, ¶¶16, 18; Bennett Declaration (Hanes Tactical), 8/11/26, ¶¶17, 19; Harrison Declaration (Harrison Gunworks), 8/12/26, ¶¶17, 19; Nguyen Declaration (Polymer Pew), 8/10/26, ¶¶17, 19; Bytyqi Declaration (Z3Pro), 8/12/26, ¶¶17, 19.

goods within the narrow and specialized product category of FRTs;[104] (b) Defendants' and Plaintiffs' products are substitutes;[105] (c) an absence of non-infringing alternatives, making it a two-supplier market;[106] (d) durable goods are typically acquired on an infrequent basis;[107] (e) the market is a differentiated niche market rather than a commodity market;[108] (f) competing products can displace another over a relatively short period of time;[109] (g) product design, perceived reliability, and brand identity can play a central role in purchasing decisions;[110] (h) the relevant products serve an enthusiast customer base in a highly visible market where product attributes are transparent and readily compared.[111]

64. Eichmann also states that "monetary relief may be further diminished by the risk of nonpayment."[112] Yet Eichmann provides no evidence or analyses to support his assertion of collectability risk other than citing to the formation of Defendants over 2020 to present and the observation that—as is typical for private companies—they have no publicly available financial information.[113]

65. Regarding the quantum of damages, first note that Eichmann expresses no opinion that Rare Breed has lost sales to Defendants and performs no analyses leading to such a conclusion.[114] Yet there are substantial differences between Accused Products and Rare Breed's

[104] Eichmann Declaration 5/28/26, ¶5.
[105] Eichmann Declaration 5/28/26, ¶10 and footnote 11, citing Luettke Declaration 5/28/26, §§IV, V (functional overlap), §VI (lack of non-infringing alternatives in the FRT category).
[106] *Ibid*.
[107] Eichmann Declaration 5/28/26, ¶10.
[108] Eichmann Declaration 5/28/26, ¶6.
[109] Eichmann Declaration 5/28/26, ¶6.
[110] Eichmann Declaration 5/28/26, ¶8.
[111] Eichmann Declaration 5/28/26, ¶9.
[112] Eichmann Declaration 5/28/26, ¶51.
[113] Eichmann Declaration 5/28/26, ¶51.
[114] As noted above (Section 4.2), Eichmann does not directly assert that Rare Breed is losing sales to Defendants, only that "[i]n this [durable goods] context, the introduction and sale of competing products would be expected, as a matter of economic theory, to result in displacement of demand from Plaintiffs' products." Eichmann Declaration 5/28/26, ¶11.

drop-in triggers (see above ¶¶32-41), and as explained by Eichmann, "competitive position is shaped not only by price, but also by non-price factors" including product design.[115] Since a simple assumption of a lost profits award therefore appears premature, I considered a potential award of a reasonable royalty.

66. In analyzing potential royalty rates, I first assume that the royalty rate of $300 per trigger paid by Rare Breed to ABC IP[116] does not represent an arms-length negotiation. First, the January 2023 Complaint in *U.S. v. Rare Breed* suggests shared ownership interests between the companies.[117] Second, based on my professional experience (supported by RoyaltySource's industry report explained below), a royalty rate of 67%[118] would be considered highly unusual and very unlikely to represent an arms-length transaction.

67. My search of RoyaltySource and ktMINE royalty databases identified four potentially-comparable firearm-related license agreements, indicating a median royalty rate of 4.5% of sales.[119] I also considered RoyaltySource's "Royalty Rate Industry Summary Report 2025," an annual analysis of royalty rates from the company's database that provides benchmarks for licensing rates covering 14 industries from over 30 years of data. The report identifies royalty rates for the industry group "Consumer Goods, Retail & Leisure" of 5.9% average, 7.2% third quartile (i.e. the median of the upper half), and 40% maximum, based on 403 agreements analyzed.

---

[115] See above ¶42, and Eichmann Declaration 5/28/26, ¶8.
[116] DeMonico Declaration 5/28/26, ¶31, citing a $300 per unit royalty for any model.
[117] Complaint, *U.S. v. Rare Breed et al*., 1/19/23, ¶83 (most of the money flowing from Rare Breed to ABC IP, LLC, and "DEF Consulting" ends up at the same four places—all current and past owners of Rare Breed, including DeMonico and Leleux), ¶84 (DeMonico, Cole Leleux, and others "own or otherwise control" Rare Breed). Cole Leleux signed the patent license agreement (and amendments) between ABC IP and Rare Breed on behalf of ABC IP, while DeMonico signed on behalf of Rare Breed. See DeMonico Declaration 4/24/26, at Exhibits A, B, and C.
[118] Calculation: $300 royalty ÷ $450 price = 67%. See DeMonico Declaration 5/28/26, ¶¶19, 59 ($450 price of the FRT-15L3), ¶31 ($300 royalty).
[119] Exhibit 3.

Rates in the next-similar group, "Machines and Tools," were similar: 5.9% average, 6.4% third quartile, and 50% maximum, based on 166 agreements.

68. I understand that Defendants have each filed declarations indicating their belief that they could pay damages in the range of 5% to 8% of sales.[120]

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: Aug 13, 2026 ______________________

Eric J. Phillips

[120] Gardner Declaration (80Mills), 8/12/26, ¶20; Morrow Declaration (DNT), 8/11/26, ¶19; Bennett Declaration (Hanes Tactical), 8/11/26, ¶20; Harrison Declaration (Harrison Gunworks), 8/12/26, ¶20; Nguyen Declaration (Polymer Pew), 8/10/26, ¶20; Bytyqi Declaration (Z3Pro), 8/12/26, ¶20.

Exhibit 1

VLF CONSULTING
VALUATION • LITIGATION • FINANCIAL

**Eric J. Phillips MBA, CVA, MAFF**
President

**Chicago Area Office**
1945 Hitchcock Ave
Downers Grove, IL 60515
(312) 489-2483 direct
(773) 354-4644 mobile
ephillips@vlfconsulting.com

**Certifications**

Certified Valuation Analyst

Master Analyst in Financial Forensics

**Professional Affiliations**

National Association of Certified Valuators and Analysts

Licensing Executives Society

**Education**

Master of Business Administration (with honors), Kelley School of Business at Indiana University

Bachelor of Science, Mechanical Engineering (with Distinction), The Ohio State University

**Biography**

Eric Phillips is President of VLF Consulting. Mr. Phillips has twenty-five years of experience in providing valuation and litigation advisory services to attorneys and corporate clients across a broad range of industries. With a focus on intellectual property litigation and valuation, Mr. Phillips has extensive experience in the valuation of patents, trademarks, copyrights, software, trade secrets, and know-how in such contexts as infringement litigation, bankruptcy proceedings, false marking, licensing negotiations and transactions, and joint ventures. His experience includes providing testimony in federal court proceedings regarding intellectual property damages. He has broad experience in damages – lost profits, reasonable royalties, past and future price erosion, convoyed sales, and prejudgment interest. He has also conducted flexible damages/valuation modeling, including probability trees, sensitivity analyses, and Monte Carlo analysis. As a Certified Valuation Analyst, he has also assisted clients with business valuation needs.

Mr. Phillips is a Certified Valuation Analyst (CVA) and a Master Analyst in Financial Forensics (MAFF) through the National Association of Certified Valuators and Analysts (NACVA). He is also a member of the Licensing Executives Society (LES).

**Professional Experience**

- VLF Consulting, President, 2011 to present.
- FTI Consulting, Senior Director, 2009 to 2011.
- Charles River Associates (formerly InteCap), Principal, 2000 to 2009.
- Tadano Faun GmbH Mobile Cranes, Nuremberg, Germany, summer intern, 1999.
- Siemens Energy & Automation, Product Engineer, Development, 1995 to 1998.

**Industry Experience Examples**

- Surgical products
- Pharmaceutical
- Measurement tools
- Construction products
- Medical testing products
- Semiconductors
- Computer hardware
- Computer software
- Consumer electronics
- Sports equipment
- Financial derivatives trading systems
- Non-profit organizations
- Automotive products
- Aviation
- Agricultural chemicals
- Biotech research tools
- Telecommunications equipment
- Wireless networking systems
- Petroleum refining
- Manufacturing

**Illustrative Intellectual Property Project Experience**

- Assisted a sporting goods manufacturer defending itself in litigation involving several patents. In this make-or-break case between the two leading manufacturers of high-end products, Mr. Phillips rebutted a sweeping damages claim by the Plaintiff. Through complex analyses of the relevant products and their next-best alternatives, Mr. Phillips successfully narrowed the scope of the purported patented benefits, undermining Plaintiff's position on the importance of the patents, thereby leading to a highly favorable settlement.

- At a patent trial involving the two leading makers of toddler feeding products, Mr. Phillips presented a broad array of damages, including profit disgorgement, lost profits, reasonable royalties, and pre-issuance reasonable royalties. Mr. Phillips's testimony achieved a complete damages victory for plaintiff, as the jury awarded all damages amounts exactly as presented.
- Engaged in multiple patent infringement disputes related to blood sampling devices for glucose monitoring, Mr. Phillips determined both lost profits and reasonable royalty damages in suits brought by a leading U.S. device manufacturer and designer.
- Supported a Tier 1 automotive supplier that had supplied electronic control modules to an auto manufacturer and had become embroiled in ensuing litigation due to its indemnifying the auto maker. Assistance included a thorough review of both plaintiff's and defendant's expert reports and a detailed analysis of 10+ years of Daubert rulings by the sitting judge in Texas. The results were successfully used to revise expert strategy and in indemnification negotiations.
- In a complex patent litigation case involving multiple patents and method and system claims related to auto-leveling systems for recreational vehicles, Mr. Phillips demonstrated the errors in plaintiff's lost profits claim and provided a reliable reasonable royalty approach that considered multiple types of value indicators.
- Determined the appropriate reasonable royalty damages for a worldwide leading tax stamp provider in a patent infringement case related to cigarette tax stamping technology. Mr. Phillips testified regarding numerous errors by Plaintiff's damages expert, opined on the appropriate royalties, and assisted the client in preparing a vigorous *Daubert* motion against the opposing expert regarding Entire Market Value Rule issues and other errors.
- Assisted a worldwide leader in heavy-haul over-the-road trailer systems who was accused of patent infringement regarding their dual-lane modular trailers. His particular expertise related to the Entire Market Value Rule was key in successfully limiting the scope of royalty damages, leading to a favorable settlement.
- In a highly complex dispute involving multiple plaintiffs, patents, and hammer mill technologies, Mr. Phillips determined lost profits, price erosion, and reasonable royalty damages for each plaintiff. Claims in the multiple lawsuits included patent infringement and false marking. Mr. Phillips' adroitness at navigating the complex legal and *Daubert* issues surrounding lost profits and price erosion led to rigorous and unassailable opinions and testimony.
- Assisted a German surgical products manufacturer in valuing its numerous trademarks used by international licensees. Mr. Phillips developed a multi-pronged valuation approach to arrive at an appropriate range of royalties that would adequately compensate the trademark owner for the use by the licensees. His opinions played a key role in negotiations and related litigation among the various international entities.
- Assisted a distributor of imported goods by valuing its proprietary enterprise management software system, a cloud-based system including both front-office and back-office applications. VLF's efforts supported the owners' strategic shift towards enhancement and commercialization of the software platform.
- Directed efforts to identify and quantify lost profits and reasonable royalty damages for dozens of clients, such as: a manufacturer of spinal implant products, a foreign maker of hard disk drives, a leading domestic computer maker, a worldwide supplier of airbag systems, and makers of branded pharmaceutical products.

## Presentations and Articles

- "A Comprehensive Guide on Apportioning Patent Damages: Tips and Strategies Explored," (co-presenter), live webcast, *The Knowledge Group*, November 2019.
- "Responding To Fed. Circ.'s Latest Patent Damages Test," E. Phillips and A. Parikh, *Law360.com*, August 2018.
- "Recent Rulings on the Entire Market Value Rule and Impacts on Patent Litigation and Valuation," E. Phillips and D. Boag, *Les Nouvelles* (journal of the Licensing Executives Society), March 2013.
- "Patent Damages Overview and Update on Current Issues," presented by E. Phillips and D. Haas, May 2011.
- "Apportionment Issues in IP Damages Cases," presented by E. Phillips and D. Haas, April 2011.
- "Judicial Impact on Patent Value," presented by E. Phillips and B. Burton, March 2011.
- "Intellectual Property," presented by E. Phillips, D. Haas, and S. Weingust to the China Appraisal Society, July 28, 2010.
- "Economic and Damages Issues in Pharma / ANDA Litigation," presented by E. Phillips and D. Haas, August 2009.
- "Using Monte Carlo Methods for Technology Valuation, Pricing, & Dealmaking," R. Razgaitis and E. Phillips. Presented by Mr. Phillips to AICPA/ASA National Valuation Conference, November 10, 2008.

## Prior Testimony (Client is Underlined)

- *Munchkin, Inc., v. TOMY International, Inc*., Northern District of Illinois, Case No. 1:18-cv-6337, Dec 2021 (deposition) and Sep 2025 (trial).
- *Ravin Crossbows, LLC v. Hunter's Mfg Co., Inc. d/b/a TenPoint Crossbow Techs*, Northern District of Ohio, Eastern Division, Case No. 5:23-cv-00598, Oct 2024.
- *Spectrum Dynamics Medical Limited v. General Electric Co., et al*., Southern District of New York, Case No.: 18-cv-11386, Oct 2023 and Sep 2021.
- *C&M Oilfield Rentals, LLC v. Apollo Lighting Solutions, et al*., Western District of Texas, Waco Division, Civil Action No. 6:21-cv-00544, Jul 2022.
- *Days Corporation v. Lippert Components, Inc., and Innovative Design Solutions, Inc.*, Northern District of Indiana, Civil Action No. 3:17-cv-00208, Sep 2020.
- *Water Technology, LLC v. Kokido Development Ltd and Menard Inc.,* Eastern District of Missouri, Case No. 4:17-cv-01906, Sep 2019.
- *Bakko Bros., Inc. and Genesis III, Inc. v. Jacobs Corp.,* Southern District of Iowa, Central Division, Civil Case No. 4:14-cv-00015, May 2017.
- *Tax-Right, LLC v. SICPA Product Security LLC*, Eastern District of Virginia, Civil Action No.: 3:12-CV-657-REP, Aug 2013.

**Exhibit 2**
*In Re: Rare Breed Triggers Patent Litigation*
*Rare Breed Triggers, Inc., et al., v. 80Mills, DNT, Hanes Tactical, Harrison Gunworks, Steven Thanh Nguyen, and Z3 Productions*

**Documents Reviewed or Relied Upon**

**Legal Filings**

- *ABC IP, LLC et al., v. 80MILLS LLC, et al.* , Fourth Amended Complaint for Patent Infringement, May 26, 2026.
- *ABC IP, LLC et al., v. DNT LLC et al.* , Sixth Amended Complaint for Patent Litigation, May 27, 2026.
- *ABC IP, LLC et al., v. Hanes Tactical, LLC et al.* , Fourth Amended Complaint for Patent Infringement, May 26, 2026.
- *ABC IP, LLC et al., v. Harrison Gunworks LLC et al.* , Third Amended Complaint for Patent Infringement, May 27, 2026.
- *ABC IP, LLC et al., v. Steven Thanh Nguyen* , Second Amended Complaint for Patent Infringement, May 27, 2026.
- *ABC IP, LLC et al., v. Z3 Productions, LLC,* Third Amended Complaint for Patent Infringement, May 26, 2026.
- 2026-05-28 Declaration of Richard J. Eichmann in Support of Plaintiffs' Consolidated Motion for Preliminary Injunction
- 2026-05-28 Declaration of Brian Luettke in Support of Plaintiffs' Motion for Preliminary Injunction
    Exh A to M - Infringement claim charts
- 2026-05-28 Declaration of Lawrence DeMonico in Support of Plaintiffs' Motion for Preliminary Injunction
- Consolidated Motion for Preliminary Injunction, May 28, 2026, and appendices, in *ABC IP, LLC et al., v. 80MILLS LLC, et al.; ABC IP, LLC et al., v. Christopher Cope, ABC IP, LLC et al. v. DNT LLC et al.; ABC IP, LLC et al. v. Hanes Tactical, LLC et al.; ABC IP, LLC et al., v. Harrison Gunworks LLC et al.; ABC IP, LLC et al., v. Mars Trigger, LLC et al.; ABC IP, LLC et al., v. Mister Guns, LLC et al.; ABC IP, LLC et al., v. Steven Thanh Nguyen; ABC IP, LLC et al., v. Optics Planet, Inc.; ABC IP, LLC et al., v. PistolCap Limited Company et al.; ABC IP, LLC et al., v. ProSource Firearms, LLC; ABC IP, LLC et al., v. Superior Firearms of Texas, LLC; ABC IP, LLC et al., v. Z3 Productions, LLC.*
    Exh F - FRT-15L3
    Exh G - FRT-15L3 Flat
    Exh H - FRT-15C3
    Exh I - FRT-MR3
    Exh J - FRT-MR3 Flat
    Exh K - FRT-RD3
    Exh L - FRT-RD3
    Exh T - Instagram posts
    Exh U - Facebook posts
    Exh V - Youtube posts
    Exh W - Facebook posts
    Exh X - Instagram posts
- 2026-08-10 Declaration of Pearson Gardner (80Mills d/b/a Tactical Titan Supply)
- 2026-08-11 Declaration of Zach Morrow (DNT d/b/a Deez Nutz Tactical)
- 2026-08-11 Declaration of Damion Bennett (Hanes Tactical)
- 2026-08-12 Declaration of Tyler Harrison (Harrison Gunworks)
- 2026-08-10 Declaration of Steven Thanh Nguyen (Polymer Pew)
- 2026-08-12 Declaration of Ari Bytyqi (Z3 Productions d/b/a Z3Pro)

**Other / Public Domain Information**

- 2023-09-05 Memorandum & Order, in *U.S. v. Rare Breed Triggers, LLC, et al* ., 23-cv-369 (NRM)(RML) (EDNY)
- 2026-01-07 (*Rare Breed v. Hoffman, et al.* ) Plaintiffs' Motion for Preliminary Injunction
- 2026-01-23 (*Rare Breed v. Hoffman, et al.* ) Response to Plaintiffs' Motion for Preliminary Injunction
    Declaration of Timothy Hoffman in Support of Defendant's Response
    Letter to Hoffman re. notice of patent infringement
    Settlement Agreement, 5/13/25 between U.S. and Rare Breed, et al.
- 2026-02-11 (*Rare Breed v. Hoffman, et al.* ) Order granting preliminary injuction
- 2026-01-15 (*Rare Breed v. Peak Tactical d/b/a Partisan Triggers* ) Complaint for Patent Infringement, False Patent Marking, and False Advertising

**Exhibit 2**
*In Re: Rare Breed Triggers Patent Litigation*
*Rare Breed Triggers, Inc., et al., v. 80Mills, DNT, Hanes Tactical, Harrison Gunworks, Steven Thanh Nguyen, and Z3 Productions*

**Documents Reviewed or Relied Upon**

- 2026-01-16 (*Rare Breed v. Peak Tactical d/b/a Partisan Triggers* ) Plaintiffs' Motion for TRO and Prelim. Injunction
  Declaration of Samir P. Warty, Ph.D. in Support of Plaintiffs' Motion for TRO and Preliminary Injunction
- 2026-01-30 (*Rare Breed v. Peak Tactical d/b/a Partisan Triggers* ) Def's Resp. in Opp. to Pltfs' Mot. for TRO and PI
  Declaration of Scott W. Cragun
  Rebuttal Declaration of John Nixon
  Declaration of Michael Stakes
  Declaration of Ben Woods, incl. 2023-09-05 (*U.S. v. Rare Breed et al* .) Order of Preliminary Injunction
- 2026-02-13 (*Rare Breed v. Peak Tactical d/b/a Partisan Triggers* ) Order Denying Pltfs' Motion for TRO and PI
- 2026-05-14 (*Atrius Dvp. Group v. Rare Breet et al.* ) First Amended Complaint for Declaratory Judgment
- Fannon, Nancy J., *The Comprehensive Guide to Lost Profits Damages for Experts and Attorneys* , 2011 ed.
- Dunn, Robert L., *Recovery of Damages For Lost Profits* , 6th Ed. Vol. 1, Vol. 2, 2022 Supplement
- "Understanding Distribution Channels in Business: How They Function," at https://www.investopedia.com/terms/d/distribution-channel.asp
- "The Pros and Cons of Direct and Indirect Product Distribution," Business Development Bank of Canada, at https://www.bdc.ca/en/articles-tools/marketing-sales-export/marketing/how-bring-new-product-market
- Andjelkovic, A. and Marija Radosavljevic, "The Length of the Distribution Channel as a Factor of its Efficiency," Strategic Management, Vol. 25 (2020), No. 2, pp. 9-17.
- RoyaltySource and ktMINE royalty rate databases
- "Royalty Rate Industry Summary Report 2025," published by IPSCIO / RoyaltySource, 2026
- https://deeznutztactical.com
- https://activesafetydesigns.com
- https://harrisongunworks.com
- https://polymerpew.com/
- https://www.z3pro.com
- https://rarebreedtriggers.com/

**Exhibit 3**
*In Re: Rare Breed Triggers Patent Litigation*
*Rare Breed Triggers, Inc., et al., v. 80Mills, DNT, Hanes Tactical, Harrison Gunworks, Steven Thanh Nguyen, and Z3 Productions*

**Firearm- or Trigger-Related Licensing Transactions**

| # | Licensor | Licensee | Title | Date | Licensed Field / Products | IP / Technology Description | Royalty Rate - Low | Royalty Rate - High | Royalty Base | Other Notes | Exclusivity | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Commonwealth of Australia | Metal Storm Ltd | Deed of Amendment to Research Agreement | 04/20/01 | Gun hardware and gun system technology | All intellectual property related to Metal Storm gun hardware and gun system technology | 2.50% | 2.50% | Net Sales | 10% royalty on sublicense fees received. Licensee engaged in manufacture of military guns, handheld grenade launchers, and shotgun/assault rifle accessories. | Non-exclusive | Form 20-F METAL STORM LTD /ADR/ EXHIBIT 4.2, 07/14/2003 |
| 2 | Detonics Small Arms Ltd | New Detonics Manufacturing Corp. | License agreement | 12/01/87 | Firearms, including 1911-style .45 caliber pistol | Licensing of manufacturing and sale of products | 4.0% | 4.0% | Gross Sales | | | Form 10-Q DETONICS SMALL ARMS LTD , 04/22/2004 |
| 3 | Richard J. Casull dba Dick Casull Research and Development | Casull Arms Corp | License Agreement | 10/14/96 | Mechanisms for revolvers and rifles, and other firearms technologies | Patents (several), applications, trademarks, trade names, copyrights, and all other intangible property | 5.00% | 5.00% | Net sales | Minimum annual royalty of $40,000; maximum of $400,000/yr. | Exclusive and non-exclusive | Form SB-2 CASULL ARMS CORP EX-10.2, 11/27/1996 |
| 4 | Consulting Group of Jocassee, Inc | Xcelerate, Inc. | Patent License Agreement | 09/10/20 | Enhanced Metal Matrix Composite Weapon Barrels, for worldwide use. (rifle barrels) | U.S. Patent No. 10,718,586 plus continuations, divisionals, etc. | 5.0% | 5.0% | Gross Sales | Upfront fee of 5,000,000 shares of Licensee's stock | Exclusive | Form S-1/A Xcelerate, Inc. Exhibit 10.8, 07/31/2024 |

| | Royalty Rate - Low | Royalty Rate - High |
|---|---|---|
| Min - Max | 2.5% | 5.0% |
| Median | 4.5% | 4.5% |
| Average | 4.1% | 4.1% |

**Notes:**

[1] Source: RoyaltySource and ktMINE royalty rate databases.

RoyaltySource searches included its "weapon related (gun)" category, returning 11 results. Excluding those agreements related to projectiles/munitions and those unrelated to manufacturing or design resulted in the 4 remaining licenses shown.

ktMINE searches included: (1) SIC Code 3484 - Small Arms (0 results); (2) IP Type = "Patent" and Keyword ="trigger" yielded 50 results, none of which pertained to firearms. (3) IP Type = Patent, Technology, or Intellectual Property, with Keyword ="firearm" yielded 27 results. Excluding unrelated industries left one result (Casull Arms license, shown above). (4) IP Type ="Patent" and Semantic AI Search ="firearm trigger" yielded 16 results. Excluding unrelated industries left one result (Casull Arms license, shown above).